# STATE v. BOARD OF COUNTY COMMISSIONERS OF LARAMIE COUNTY.

Taxation — Liability of County for State Levy — Public Indebtedness — Charitable Institutions, Tax to Support — Penitentiary, Tax for Support of — Constitutional Law.

1. It is competent for the State to make the county or other taxing district responsible as principal debtor for the quota of State tax assessed within it.

2. The tax for county revenue is not applicable to the payment of a deficiency in State levies for which a county may have become responsible, since the tax for county revenue is laid distinctively for county, as opposed to State, purposes.

3. The special levy authorized by statute to be made by a county to pay a deficiency due upon a State levy can not be made in anticipation of a deficiency, but only after a deficiency has arisen

4. The responsibility of a county to the State for taxes levied within such county for State purposes, not growing out of the ordinary control of county affairs, nor connected with its local concerns as a distinctive governmental subdivision, but arising out of its relation as a taxing agency between the State and taxpayer, the debt or obligation is not included within the constitutional limitations upon county indebtedness.

5. The question of diligence or negligence of collecting officers, or loss of taxes by removal of assessed property or of the taxpayer, is of no consequence in determining the liability of the county to the State; since the statute makes no exceptions based on diligence, or inability to collect for any other reason than the existence of double or erroneous assessments.

6. The special levy authorized to be made by a county to pay a deficiency due the State upon State levies is excluded from the limitation of twelve mills upon taxation for county revenue.

7. Such special levy is also unaffected by the four mill limitation upon the annual tax for State revenue. The reasonable construction of that limitation (Const., Art. 15, Sec. 4) is that it applies to the regular annual levy for State revenue, which is imposed alike upon all the counties and all the property in the State.

8.  The power of the Legislature to impose upon the county a liability for State taxes levied upon property within its borders, is not inhibited or restricted by any constitutional provision.

9.  In an action brought by the State against a county to recover taxes alleged to have been regularly levied by the territorial officers of the territory of Wyoming, or by the State officers of the State of Wyoming, and alleged to be unpaid by such county, it is no defense that such taxes, remaining unpaid by the county, were, in fact, never collected by the county, and were, in fact, uncollectible, either by reason of the fact that personal property on which the same was levied was removed from the territory or State before the taxes could be collected, or by reason of the fact that such tax was levied upon real estate, which was subsequent to such levy, at a regular sale, offered for sale, and could not be sold for want of bidders; the county officers having used due diligence in endeavoring to collect such taxes.

10.  The total liability of the county is the aggregate amount of the State levy extended against its assessed property. Its resultant liability is measured by the difference between the aggregate levy and the sum of the amounts collected and paid over, and of the credits to which it may be entitled. Although such resultant liability may exceed the means first provided for its discharge, the law furnishes other adequate means for payment without infringing upon any fund devoted to general county expenses; viz., by means of a special levy to cover the ascertained deficiency.

11.  When property previously omitted from the assessment roll and tax list is placed thereon, in pursuance of the statute, after the tax list has been committed to the collector, it becomes immediately subject to the previous levy made by the board, as well for state as county taxes. The same rule applies to property which comes into the State after the annual assessment, and is assessed as provided by law. The provision of the statute (Sec. 3836) imposing the liability upon the county for State taxes, covers taxes upon property, assessed as aforesaid.

12.  It is no defense in a suit by the State against a county for State taxes, that the amount sought to be recovered was realized from taxes upon property placed upon the tax list subsequent to the time the State levy was extended thereon; whether the property was previously omitted from the assessment roll, or came into the county after the making up of the tax list.

13. The term "charitable institutions," as it is employed in Section 4 of Article 15 of the constitution, excepting from the limitation of four mills upon State taxation taxes levied for the support of State educational and charitable institutions, is to be interpreted as referring to that character of institution which springs from philanthropic or humane impulses, or is prompted by a desire and purpose to ameliorate the condition of the unfortunate, afflicted, or defective classes, by affording them proper and humane care, assistance, or education, or placing them under suitable restraint, treatment, or reformatory influences; thereby not only benefiting the individual, but promoting the well-being of society.

14. Construing said term in the light of other constitutional provisions, and in view of the humane idea of reformation out of which originated the modern penitentiary, the penitentiary of this State is included within the purport of said term "charitable institution" in the sense in which it is employed in said constitutional provision, and a State tax is not invalid which, by including the tax for the support of the penitentiary exceeds four mills.

15. A State tax is levied for the support of an institution, where its object is to provide the necessary buildings and equipment without which it would be useless or inefficient.

[Decided December 17, 1898].

On reserved questions from the District Court, Laramie County, HON. RICHARD H. SCOTT, *Judge.*

This was an action brought by the State against the Board of the County Commissioners of the County of Laramie to recover certain State taxes alleged to be due the State from said county. The defendant demurred to the petition, which had set out in full all the facts out of which the liability of the county was claimed to have arisen. At the hearing upon the demurrer, the district court, deeming certain legal questions arising thereon to be difficult and important, ordered the cause to be reserved to the supreme court for its decision upon said questions. The questions so reserved, and the facts so far as material, are stated in the opinion.

*J. A. Van Orsdel,* Attorney-General, for the plaintiff.

The fact that the taxes were not collected by the county is no defense.   (Rev. Stat., 3836; State v. Co. Com'rs., 4 Wyo., 313; State v. Multomah Co., 13 Or., 294; Mayor v. Davenport, 92 N. Y., 614; State v. Kings Co., 125 N. Y., 312; County v. Com., 36 Pa. St., 524; Winchester Co. v. Toyer, 24 Wis., 312.)

In matters of taxation, the county is made the debtor of the State to the extent of the State's quota.   (Connor v. Co., 10 Atl., 772; Co. v. Comm'rs., 36 Pa. St., 524.)

But in a general way the county officers are the local agents of the State for the purpose of collecting the State's revenue.   Laramie Co. v. Albany Co., 92 U. S., 312; Russell v. Reed, 27 Pa. St., 170; State v. Co. Court, 34 Mo., 572; R. R. Co. v. Washington Co., 30 Gratt., 474.)

The power of the Legislature over counties is plenary and absolute, except as restricted by the Constitution, and it may require of them and their officers such public duties and functions as fall within the scope and objects of municipal organization and are necessary to the needs of State government.   State v. McFadden, 23 Minn., 40; Co. of Richmond v. Co. of Lawrence, 12 Ill., 1; State v. Commissioners, 12 Kan., 426; Wade v. Richmond, 18 Gratt., 583; State v. Dorsey, 28 Ark., 378.)

Therefore, as the interests of State and county are common, it is not to be presumed the State will take advantage of its power and so legislate as to injuriously tax and destroy the interests of its counties, nor, on the other hand, is it to be presumed a subdivision will be allowed to deprive the State of its just proportion of the revenues collected by it.   This would be manifestly unjust, for were it not for the legislative delegation of power to tax, the subordinate county would be powerless to tax even for its own needs.   The State acts by the municipal governments, and their acts in levying taxes are as much the act of the State as if it acted by its own officers.   (Desty on Taxation, Vol. 1, 465; Gilman v. Sheboygan, 2 Black, 510; Knowlton v. Rock Co., 9 Wis., 410; Lunsden v.

Cross, 10 Wis., 282; Co. v. Mighels, 7 O. St., 109; State v. Gracey, 11 Nev., 228.) Any addition to the list of assessable property which may have been made by the county officers after the delivery of the tax list to the collector is but an amendment to the original list, and consequently subject to all provisions of the statute which may have applied to the original list. (Harwood v. Brockfield, 130 Mass., 561.)

The word "institution" as used in the constitution is a description of the place or establishment where certain branches of the State business or organization are carried on. (25 O. St., 244; 1 Ency. L., 236; 1 Abb. L. Dict., 629; City v. Sturdevant, 24 Ind., 39.) The meaning of the word "charitable" is generally derived from the Statute of 43 Eliz., Ch. 4, which is a part of the common law, and in force here. (Rev. Stat., Sec. 498; State v. Foster, 5 Wyo., 199; Jackson v. Phillips, 14 Allen, 539; 1 Abb. L. Dict., 209; McGill v. Brown, Brightley, Pa., 347; 7 Johns Ch., 292; 30 Pa., St., 437; 1 Kean, 234; Ambler, 651; 24 Conn., 349; 10 Allen, 177.)

The authorities cited establish a legal meaning to the word "charitable," comprehending such institutions as houses of correction and penitentiaries. It seems hardly necessary to rely upon the application of the statute by analogy, for the application is direct, a penitentiary being an institution of the same general character as a house of correction, and I believe I may safely say, that the use of the phrase "house of correction" in the Stat. 43, Eliz., was intended by its framers to embrace penal institutions of all kinds then in use, such as workhouses, jails, or other places for the confinement of persons convicted of crimes or misdemeanors. The word "penitentiary" is of later origin, being first used in statutes a century later than the date of Stat. 43, Eliz. The difference between a penitentiary and a house of correction; viz., the one for adult, and the other for juvenile offenders, is not such as to take either one out of the classification of charitable institutions.

If it be held that a house of correction is a charitable institution (and certainly it must be so held under the Stat. 43, Eliz.), it can not reasonably be said a penitentiary, the purpose of which is the confinement and improvement of an older class of offenders, is not equally a charitable institution. Any doubt as to the similarity of a house of correction and a penitentiary should give way in the light of the Statute of England, which provided "that when any person is convicted of any theft, or larceny, and burnt in the hand for the same according to the ancient law, he shall also at the discretion of the judge be committed to the house of correction or public workhouse to be there kept to hard labor," etc., and later by Stat. 19, Geo. III, C. 74, "all offenders liable to transportation may . . . be confined to hard labor in certain penitentiary houses." (Blackstone's Com., Book IV, 370; Cooley's 3d ed.) It must be conceded if a penitentiary is a charitable institution, that any levy of taxes for its support or maintenance need not be included within the four mills authorized by the Constitution for State revenue, but would properly come within the exception in Section 4, Article 15.

That a penitentiary is a charitable institution I maintain is a correct conclusion to draw from the language of the statute constituting a part of the common law in force in this State, and from the language of adjudicated cases.

If the tax is excessive, only so much as exceeds the limitation is void. (Mix v. People, 72 Ill., 243; O'Kane v. Treat, 25 Ill., 557; Buscon v. Allison, 43 Ill., 291; State v. Allen, 43 Ill., 456; Allen v. R. R., 44 Ill., 85; People v. Nichols, 49 Ill., 517; Clifton v. Wynne, 80 N. C. 149.) The county can not question the legality of the State tax levy. (92 N. Y., 604; 36 Ind., 184; 80 N. C., 145; 66 id., 371; id., 632; 6 Ired., 191; 7 id., 68.)

*Robert W. Breckons* for defendant.

The defendant in this case maintains that the provisions of Sec. 5, Art. 15, and Sec. 4, Art. 16, of the con-

stitution negative the idea that a county is indebted to a State by reason of taxes levied and remaining uncollected through no negligence on the part of the county. Up to the year 1895 by the provisions of Section 3768 of the Revised Statutes, the various counties were permitted to make levies for purposes specified in that section, not to exceed the twelve mill limitation of the constitution. These purposes were, "ordinary county expenses;" "support of the poor and lunatic;" "road purposes;" "taxes sufficient to defray expenses of the district court;" and "county school purposes."

Perhaps, under the decisions of the Supreme Court, they might have been permitted to levy a judgment fund in conformity with the provisions of Section 1798 of the Revised Statutes. During the year for which such taxes were levied under the provisions of Section 6 of Article 16 of the constitution, no debt in excess of the amount thereof could be incurred except by a vote of the people.

An examination of our statutes will disclose that there is no method by which the Board of County Commissioners can in any given year levy a tax for the purpose of meeting any deficiency in the collection of State taxes for that year. In many States a provision exists in the revenue laws by which counties may levy a tax or percentage for the purpose of meeting an anticipated deficiency, but Wyoming is not numbered among these States. According to the theory of the attorney-general, after the abstract of the assessment roll of a given county is sent to the State board, and after the board, in conformity with the power conferred upon it by the laws of the constitution, make a levy, the county becomes debtor to the State for the amount of such levy. Under this construction there can be no question but that a debt is created, and there can further be no question but that this debt is created during the year the levy is made. That the constitutional provision cited covers debts of this character, see the Baker case, 6 Wyo., 369.

It would seem, then, that the only remaining question

to be determined in order to ascertain whether Section 2 of Article 16 is applicable in this case, is as to whether or not such a debt is in excess of the taxes for the current year.   There being no statutory authority authorizing the levy of a tax to meet the anticipated deficiency in the amount of the State tax, no levy can be made for this purpose prior to the occurrence of such deficiency.   It would, therefore, seem plain and beyond any question that such debt is in excess of the tax for the current year.

It can not be urged that this deficiency could be met out of the fund raised by the levy for general revenue purposes in the county, for several reasons.   The fund raised in a county at present for general revenue purposes under the provisions of Section 3768 of the Revised Statutes of Wyoming, as amended by Chapter 102 of the Laws of 1895, is clearly contemplated, when considered in connection with the provisions of Chapter 106 of the Laws of 1895, and Chapter 33 of the Laws of 1893, as a fund to be applied solely for the purpose of paying the ordinary expenses of the county, such as salaries of county officers, expenses of the district court, etc.   The tax levied under the county revenue clause is levied for the payment of such ordinary expenses, and, under the provisions of Section 13 of Article 15 of the constitution of the State, can be applied for no other purpose.

In view of these facts, how can a judgment rendered in this case for arrears due the State ever be paid?   No levy, as has already been shown, can be made for the purpose of paying any anticipated deficiency.   Should a tax be levied the ensuing year, it could be defeated in an action by any county taxpayer on the ground that it was a debt created in excess of the tax for the current year.

The attorney-general contends that the county is a debtor to the State for the amount of tax levied by the State board of Equalization.   If the county is debtor to the State for the amount of State tax levied on the assessment sent to the State board of equalization, that is all the State can demand.   If a county is but an agent of the

State for the purpose of collecting the State tax, and therefore accountable to the State for all taxes so collected, even though the property upon which it is collected is placed upon the tax roll subsequent to the time the State board of equalization has fixed the levy, then, like any other agent, it may show as a defense to the action that it was impossible to collect part of the taxes. If a county may not show that it has been unable to collect, it must be on the proposition that it is the absolute debtor to the State for a certain amount. And if it is the absolute debtor to the State for a certain amount its obligation has been fulfilled in every respect when it has paid that exact amount. If a county is a debtor to the State for the amount of the State tax levied upon the assessed valuation of the property of the county, as shown by the abstract of the assessment roll sent to the State board of equalization, every obligation due to the State has been discharged when it has paid the amount of State tax due on that valuation.

There is no force whatever in the argument advanced by the plaintiff to the effect that such a construction would lead counties to omit to place upon the tax list, until after the State tax was extended, certain property desired to be favored for local reasons. Should all the counties in the State do this, the result would simply be that the State tax would be higher, or that the State board of equalization, acting under authority given it by the statute, would simply have to increase the assessment.

Was the State levy for 1893 excessive? The defendant maintains that it was.

With the money raised by the capitol tax, all necessary expense for maintaining and keeping in repair the capitol building, and the necessary expense of fencing, grading, and otherwise improving the capitol grounds were paid. With the money raised from the Penitentiary building tax, the expenses of completing the State Penitentiary building at Rawlins were paid. That these two taxes, or

either of them were not for the support of the State educational or charitable institutions, or for the payment of the State debt, and the interest thereon, is clear.  Neither of them are for the payment of the State debt, and the interest thereon, and the question may be further limited. Were the taxes so levied for the support of State educational or charitable institutions?

We urge in this matter, first, that a tax for the building and completion of the Rawlins Penitentiary is not a tax for the support of an educational or charitable institution, even if it should be held by the court that the Penitentiary is a charitable institution.   The word " support " means for the maintenance of; furnish what is needed; provide for; as to support a church or family.   See Standard Dictionary.   Under the terms of the law under which this tax is levied, not one cent of it goes for the purpose of maintaining the Rawlins Penitentiary, or providing for it.   It all goes for the creation of the Rawlins Penitentiary.   To say that a tax for the building of an institution comes within the exception providing for the support of an institution would be to give to the words a meaning different from that ordinarily applied to them.   So far, then, as the tax for the building of the Rawlins Penitentiary is concerned, we conclude that it is not within the exception of the constitutional provision because it is not a tax for the support of that institution.

We next contend here, that beyond any question a tax under the laws of the State of Wyoming, to be applied in any manner to a penitentiary, either for its building or for its support, is not a tax for an educational or charitable institution.   In the brief of the plaintiff in this case, it is not contended that a penitentiary is an educational institution.   It is said, however, that it is a charitable institution.   This proposition is advanced on the theory that, in the State of Wyoming and in the United States in general, the legal meaning of the word " charitable," and what is comprehended by the words " charity," " charitable,"

8

and the phrase " charitable uses," comes from the statute of 43 Elizabeth, Chapter 4, which is the common law and in force in Wyoming.

Without any reference at length to the numerous authorities cited by counsel for the plaintiff, it is sufficient to say that all of them are with reference to the upholding of bequests for certain charitable uses, and none of them in any sense bear upon the question here. If, in this State we have adopted the Statute of Elizabeth, we certainly have adopted it only in so far as charitable uses are concerned; and if we have adopted the definition of the word " charitable " we have adopted such definition only for the purpose of upholding bequests. We can see no force whatever in the argument that the adoption of the definition of a word upon one particular subject shall be conclusive upon the courts when that word is used in connection with an entirely different subject.

But even if such rule prevailed it is very evident that, in the State of Wyoming, the words " charitable institutions " have never been used in the constitution and the statutes of the State in any manner which would lead us to believe that the constitutional convention or the Legislatures intended to embrace within its meaning penitentiaries. The history of the adoption of the constitutional provision shows very clearly that no such meaning was attached to the words " charitable institutions." Under the argument of counsel in this case, an educational institution would be a charitable institution, and had the framers of the constitution intended this broad meaning to be attached to the term " charitable institutions," they would not have used the words " educational institutions." Throughout the entire instrument all that would have been necessary would have been to use the words " charitable institutions " had the Legislatures intended any such broad meaning.

A penitentiary, as defined by the Standard Dictionary, is a prison or a place of punishment, especially one in which convicts are confined at hard labor for a punish-

ment and reformation. In what sense it may be regarded as charitable we are unable to understand. The definition of "charity" is given by the same dictionary, a definition which would certainly not include within it a penitentiary: "Generous in gifts to the poor; liberal, as a charitable man; characterized by love and good will; benevolent; kindly; lenient."

Should it be held that the levy in question is void, as being in excess of the constitutional limitation, we concede that the levy for educational and charitable institutions, and for the payment of the State debt, may be permitted to stand. They are readily separated from the balance of the levy, and there is express authority for the making of the levies.

But, we contend that if the levy is void as being in excess of the rate fixed by the constitution, the entire levy for general revenue, for the Rawlins penitentiary, and for the State capitol, must fall. To support this rule we need not discuss the differences between the authorities. The most liberal rule laid down by the books in favor of upholding part of a levy would not apply here. (25 O. St., 520; 19 Fla., 664; 16 Mich., 12; 78 id., 117; 3 Wyo., 633.)

The county may plead as a defense the invalidity of the State levy. (99 U. S., 582; 105 id., 733; 25 O. St., 520; 12 Pac., 612.)

Potter, Chief Justice.

This action was instituted on the part of the State to recover from the County of Laramie certain taxes claimed to be due on State levies for the years 1889, 1892, 1893, 1894, and 1895.

To the answer of the defendant, a demurrer was filed, and upon the hearing thereof, certain questions deemed to be important and difficult were reserved by the district court for the decision of this court.

The first question is as follows:

"In an action brought by the State of Wyoming against any county in the State, seeking to recover taxes alleged to have been regularly levied by the territorial officers of the territory of Wyoming, and alleged to be unpaid by such county, is it any defense to such action to show that such territorial taxes remaining unpaid were, in fact, never collected by the county, and were, in fact, uncollectible, either by reason of the fact that personal property on which the same was levied was taken from the jurisdiction of the territory before such taxes could be collected, or by reason of the fact that such tax was levied on real estate, which was subsequent to such levy, at a regular sale, offered for sale, and for which no bidders could be secured, the county officers having used due diligence in endeavoring to collect such taxes?"

The second question is like the first except that it refers to taxes regularly levied by the State officers instead of territorial. The first question covers the taxes levied in 1889 under a territorial form of government, and the second is applicable to the taxes of succeeding years, and after the admission of Wyoming as a State. The two questions may, appropriately, be discussed together; the difference between the two, from a legal standpoint, being the effect, if any, of constitutional provisions. Our scheme of taxation embraces a direction or fixing of a rate for State taxes by the State board of equalization, a notification thereof to the county clerk of each county, and a levy therefor, together with a levy of county and school taxes, by the board of county commissioners. The assessment rolls are prepared by the county assessors, the valuations of railroad and telegraph lines and of live stock being fixed by the State board. The tax lists are prepared by the county clerks, and upon the several county treasurers as collectors of taxes, devolves the duty of collecting the State, county, and school taxes in their respective counties. That was likewise the scheme under the territorial form of government.

Section 3836 of the Revised Statutes of 1887 was in

force in 1889 and during each of the years above mentioned. It is as follows:

"Each county is responsible to the territory (State) for the amount of tax levied for territorial (State) purposes, excepting such amounts as are certified to be double or erroneous assessments, and no allowance or credit shall be given to any county for any part other than this, of such tax levy remaining uncollected."

Pursuant to the provisions of the succeeding section (3837) the county treasurer is required to make a settlement annually, on or before the first Monday of January, with the State treasurer for the tax levy of the preceding year. That section also provides that: "Delinquencies on the part of any county in payment of the territorial (State) tax levy shall bear interest at the rate of eight per centum per annum, after the fifteenth day of January when said levy was payable to the territorial (State) treasurer; and in case of any such delinquency on the part of any county, it shall at once be the duty of the territorial (State) treasurer to cause an action at law to be brought against such county in the name of the territory (State) of Wyoming, to recover the amount of any such delinquency. * * * In case any judgment is obtained in such action, it shall be the duty of the board of the county commissioners of the county against which such judgment is obtained, at the time of the next annual levy of taxes, to cause a special levy to be made at a rate sufficient to pay said judgment and interest thereon at the rate of eight per centum per annum, which levy shall be in addition to the regular levies made in said county for the year. The board of the county commissioners of any county may, without suit or action, make the special levy necessary to raise the amount of any such delinquency."

Respecting the first question, covering the unpaid tax for 1889, counsel for defendant concedes the liability of the county, under these statutory provisions, unless some constitutional provision now in force will prevent payment.

The statutes above quoted were construed in regard to certain particulars in State v. Board of Commissioners of Laramie Co., 4 Wyo., 313, and it was assumed that they imposed an absolute liability upon the county except for assessments certified to be double or erroneous.

It is well settled that it is competent for the State to make the county or other taxing district responsible as principal debtor for the quota of State tax assessed within it. Cooley on Taxation, 468; State v. Baker Co., 24 Or., 141; State v. Multomah Co., 13 Or., 287; New York v. Davenport, 92 N. Y., 604; Bayonne v. State, 41 N. J. L., 368; State v. Township of Bernards, 42 N. J. L., 338; Shields v. Patterson, 55 N. J. L., 495; People v. Fitch, 148 N. Y., 71; Northup v. Hoyt (Or.), 49 Pac., 754.

Respecting this question, the controversy in the present case arises from the contention on the part of the defendant that such a debt as the statutes attempt to impose upon the counties is prohibited by the provisions of section 4 of Art. 16 of the constitution, which declares that "no debt in excess of the taxes for the current year, shall, in any manner, be created by any county or subdivision thereof, or any city, town, or village, or any subdivision thereof in the State of Wyoming, unless the proposition to create such debt shall have been submitted to a vote of the people thereof and by them approved." Reference is also made to Section 5, of Art. 15, which limits the annual tax for county revenue to twelve mills for all purposes, including general school tax, but exclusive of State revenue, and except for the payment of the public debt and the interest thereon, and to Section 13 of Article 15, requiring that every law imposing a tax shall state distinctly the object of the same, and that it shall not be applied to any other purpose.

It is urged that the deficiency in State levies can not be paid from the proceeds of the tax for county revenue, and that, as no levy for an anticipated deficiency is permissible, the debt, if any, arising on account of a deficit in col-

lections must necessarily constitute a debt in excess of the taxes for the current year.

We agree with counsel that the tax for county revenue is not applicable to the payment of a deficiency in State levies for which a county may have become responsible.

Prior to 1895, the law authorizing taxation for county purposes did so by the use of the following explanatory words, "for county revenue for ordinary county expenses not more than five mills on the dollar," and also permitted additional limited levies for road and district court purposes and the support of the poor. Rev. Stat., Sec. 3768. In the year above mentioned, by amendment and re-enactment it was provided that for county revenue for all purposes there shall be annually levied a tax not exceeding twelve mills on the dollar, including general school tax, and exclusive of State revenue and the payment of the public debt. Laws 1895, Chap. 102. The omission from the act of 1895 of the words, "for ordinary county expenses," theretofore employed, we do not regard as significant of any intended change of the purpose of the tax, as the later act following quite closely the language of the constitution, clearly distinguishes county from State revenue. It is moreover provided by Section 3837 Rev. Stat., already referred to and quoted from, that funds to meet the deficiency shall be raised by a special tax. The tax for county revenue, therefore, is laid distinctively for county as opposed to State purposes.

In Northup v. Hoyt, supra, the supreme court of Oregon held that funds received for general county purposes were applicable to the payment of the amount of State tax apportioned to the county notwithstanding that their constitution, like our own, restricted the use of tax proceeds to the purpose for which they were levied. The decision was, however, grounded upon the peculiar system in vogue in that State, and statutory provisions which required State taxes to be paid by the county treasurer to the State out of the first tax moneys collected; and it was held that money collected on State taxes belonged to

the county as well as that derived from taxes levied for county purposes, and the county occupied the position of a debtor to the State for the amount apportioned to it.

In Wyoming the taxes collected on levies for State purposes do not belong to the county, although the latter is responsible to the State therefor. See Sec. 1832, Rev. Stat. Neither are State taxes payable by the county out of the first fruits of general taxation.

It is likewise true that the county is unauthorized to make a special levy in anticipation of a deficiency. The total liability of the county is the aggregate amount of the levy extended against its assessed property. That will not exceed the taxes levied; but its resultant liability is measured by the difference between the aggregate levy and the sum of the amounts collected and paid over, and of the credits to which it may be entitled. This resultant liability will exceed the income derived from the means first provided for its discharge, but the law furnishes other adequate means for payment without infringing upon any fund devoted to general county expenses. True, the special levy can not be resorted to in the same calendar year as that in which the regular levy was made out of which the deficiency may have arisen. Under such circumstances, where the money required to meet a liability is provided for by some legislative scheme positively prescribing that it shall be raised by taxation and appropriated to the payment of the particular liability, it has been held that the public debt has not been increased within the meaning of certain prohibitions, such for instance as those restricting the amount of county or municipal indebtedness. Read v. Atlantic City, 49 N. J. L., 558.

We think the question in hand is to be determined upon somewhat different and perhaps broader considerations. The State does not look to the individual tax payer for its revenue, but deals alone with the county, which is constituted a debtor for the aggregate State tax required to be levied within it, less certain deductions and credits specifically mentioned in the statute.

It is merely a scheme of State taxation. The practical effect of the law is to apportion to the county an amount, capable of exact determination, to be raised for the purpose of State revenue, or, in other words, to impose that amount upon the taxable property within the county as its due and proper share of the financial burdens of the State. Losses in collections are bound to occur, and this fact is generally recognized by the courts. The Legislature has deemed it wise to cast such losses upon the counties, and has provided a method for discharging that responsibility which does not interfere in any way with the ordinary conduct of county affairs.

This obligation is not related to the conduct of ordinary county concerns viewed in its local administrative character. It is clearly distinguishable therefrom, and is hardly to be classed among those obligations respecting the creation of which the section of the constitution relied upon intended should be subject to submission to, and approval of, the people.

The convention which framed the constitution was not ignorant of the existing laws concerning the collection of State taxes. Such ignorance could not be assumed even if a presumption thereof was not dispelled by the reference to State revenue in its exclusion from the limitation upon a levy for county purposes.

It has been shown and counsel concedes that the liability of the county is not chargeable against the funds derived from the tax for county revenue. In that respect the case of Grand Island and N. W. R. R. Co. v. Baker, 45 Pac., 494 (6 Wyo. 369), is distinguishable from the one at bar. In that case it was held that the constitutional limitations applied not only to debts voluntarily contracted by the county authorities, but as well to certain obligations imposed by law, such as salaries of officers, fees of jurors and witnesses in criminal cases, bounties for the destruction of predatory wild animals, expenses of the district court, and compensation to a land owner for land taken for a public road. All of these were found to be payable out of the funds raised by the

limited tax for county revenue, and that fact with the limited tax provision was held to control largely in the construction of the debt limitation clauses of the constitution. We announced in that case that it was not intended to determine whether all financial obligations of a county were included in the constitutional prohibitions.    It was suggested that as to one class; viz., damages recovered against a municipality for a tort, it had been held by eminent courts they were not covered by similar limitations.    Since then other cases to the same effect have come to our notice. See Mc Aleer v. Angell, 19 R. I., 688; Thomas v. Burlington, 69 Iowa, 140; Bartle v. Des Moines, 38 Iowa, 414; Bloomington v. Perdue, 99 Ill., 329; Chicago v. Sexton, 115 Ill., 230.    In Mc Aleer v. Angell, the Rhode Island court said: " If it be argued that to hold that a town is not liable for any debt in excess of the said limit, might nullify its statutory liability for damages resulting from defective and unsafe highways, it is enough to reply that we do not think a judgment against a town in a case of that sort, although a debt, could be properly said to be a debt incurred under the provisions of the statute above quoted, the prohibition evidently being against debts voluntarily incurred in the ordinary manner.    Such has been repeatedly held to be the law elsewhere.    Moreover the statute provides a special method of enforcing judgments against towns in case the town treasurer has not sufficient funds in his hands to pay the same; viz., by the court ordering the levy and collection of a tax to pay the judgment. So that, even in case of such a judgment against the town which is up to its debt limit it could be paid in the manner provided, without increasing the town debt." 19 R. I., 688.    The case of Thomas v. Burlington, supra, involved a claim for taxes illegally collected from an individual taxpayer, and it was held to be uncontrolled by the debt limitation.

The county's responsibility to the State not growing out of the ordinary control of county affairs, nor being connected with its local concerns as a distinctive govern-

mental subdivision of the State, but arising out of its relation as a taxing agency between the State and taxpayer, the debt or obligation is not such a one as is intended or included in constitutional limitations upon county indebtedness.

The question of diligence or negligence of collecting officers, or loss of taxes by removal of assessed property or taxpayer, is of no consequence, as the statute makes no such exceptions based on diligence or inability to collect for any reason other than double or erroneous assessments.

The constitution excepts the tax for State revenue from the limit placed upon county taxation. The special levy authorized for deficiency is for State revenue in the sense that it is levied for State purposes and is to be paid to the State. It is therefore, we think, clearly excluded from the twelve mill limitation upon the power of the county to levy taxes for its current revenue. It is likewise unaffected by the four mill limitation upon the annual tax for State revenue. The reasonable construction of that limitation is that it applies to the regular annual levy for State revenue which is imposed alike upon all the counties and all the property in the State. It should not be extended beyond its terms, and we do not think it can be held to prevent the State from securing a full return to it from the counties of the annual levy lawfully laid within the prescribed maximum rate. The Legislature has the power to impose upon the county a liability for State taxes levied upon property within its borders, and that liability is not inhibited or restricted by any constitutional provision. While, therefore, the special levy for deficiency is in the sense stated a tax for State revenue, it is to be fairly distinguished from the annual levy which is subject to a limitation as to rate, the former being essentially a tax to discharge the obligation of the county for a previous annual State levy. The references counsel makes to the address to the people prepared by the constitutional convention support rather than contravene this view. In that address the following is mentioned in counsel's brief:

"The extravagance in the management of county affairs that has prevailed in the past has been circumscribed and rendered impossible. The restrictions upon taxation, and the creation of public debts are such as to necessitate economy in public affairs, and insure to the people the highest excellence in government for the least money."

"Restrictions upon legislation and loose appropriations of public moneys are clear and positive."

The debt to the State does not flow from any extravagance in the management of county affairs. Neither does it prevent economy in public affairs.

This precise question, so far as we have been able to discover, has been decided in only one case by a court of last resort. The supreme court of Wisconsin has leaned strongly toward a very strict construction of the constitutional provisions of that State restricting public indebtedness. Their constitution prohibits any county, town, village, or other municipal corporation from becoming indebted in any manner or for any purpose to any amount, including existing indebtedness in the aggregate exceeding five per centum on the value of the taxable property therein.

The laws of that State require State taxes to be apportioned among the several counties, and these together with the county tax to be apportioned by the county among the several towns, cities, and villages therein. The taxes are collected by the collecting officers of the respective towns, cities, and villages. The town, city, or village treasurer is required to pay over the full amount of State tax on or before a certain date to the county treasurer, although it may occasion a deficiency in the town, city, or village taxes. The county treasurers must likewise pay to the State treasurer the amount of State taxes charged to their respective counties on or before a date named in the statute. Whenever any county fails to pay to the State treasurer the whole or any part of the State tax, interest is required to be added, and the secretary of state is required

annually, at the time of the apportionment of the State tax, to add to the amount charged to each county respectively all amounts which may be due the State and unpaid from such county on any former tax, together with interest thereon.

Thus, in that State the loss or deficit in collections is borne entirely by the counties and their local subdivisions, and none of it is entailed upon the State. It is regarded by the statute as a debt, as interest is added to it. See Wisconsin Statutes 1898, Vol. I, Secs. 1069-1124.

The supreme court of Wisconsin in a recent case has held that the amount of State and county taxes levied on property in a municipality is not to be computed in ascertaining the amount of its indebtedness and determining whether the limit has been reached or not. State v. Common Council of Tomahawk, 96 Wis., 73, 94. The opinion contains no discussion of the proposition, but it is plainly so declared, and the annotators of the Wisconsin statutes evidently understood such to have been the decision. See Wisconsin Statute 1898, Vol. I, bottom page 124, where the following statement is found in the notes to the constitutional provision limiting indebtedness, and citing the above-mentioned case, "The amount of State and county taxes levied on property in a municipality is not to be computed."

For the foregoing reasons the first and second questions must be and are answered in the negative.

The third question is as follows:

"In an action brought by the State to recover taxes alleged to be due and unpaid by a county of the State, is it sufficient defense to such action to show that such taxes were uncollectible, and that there was no authority for a levy by the board of county commissioners of such county for the purpose of raising a fund to pay such uncollectible taxes to the State, and that no fund can legally exist out of which any such payment could be made?"

There is authority for a levy, and a fund can be legally

raised with which to pay to the State the uncollected taxes. Such a defense, therefore, based upon an erroneous construction of the law, is not good.

The following question is numbered four in the order of reservation :

" In an action brought by the State against any county in the State, seeking to recover State taxes alleged to be due and unpaid, is it any defense to show that the amount so sought to be recovered was realized from taxes levied on property placed upon the tax list by such county subsequent to the time the State levy was extended upon the tax list, and subsequent to the time the tax list was placed in the hands of the collector, the said property so added being property omitted from the assessment rolls, and property coming into the county subsequent to the time the tax list was made up ? "

It is contended by counsel for defendant that if the county is a debtor to the State, it must be upon the proposition that it is such for a certain amount, and that the amount is fixed by the rate computed upon the abstract of the assessment roll sent to the State board, and when that account is paid the county's full obligation has been discharged.

The fallacy of the argument lies in the forced assumption that the liability is measured only by the abstract of the original annual assessment.

When omitted property is placed upon the assessment roll and tax list, in pursuance of the statute, after the list has been committed to the collector, it becomes immediately subject to the previous levy made by the board as well for State as county taxes. When property comes into the State after the completion of the annual assessment, it is to be assessed in the same manner as other property, and the levy is required to be the same as that made upon like property for the current year. State taxes are levied thereon as well as county and school taxes. Section 3836 makes no distinction between taxes against property upon the original roll and that placed there at a subsequent time by authority of law, but im-

poses a liability upon the county for the amount of tax levied for State purposes.   Upon the omitted property, and that which comes into the county afterward when assessed, a tax is levied for State purposes.   That tax is clearly covered by the provisions of Section 3836.   The reserved question refers to funds realized therefrom. They were not collected for county revenue, but were collected for State revenue.

There is no apportionment of a specific amount to the respective counties, but the State board fixes and determines the rate of State levy, and it is the duty of the proper county officers to extend that levy against all property assessed in the county for taxation.   The statutes are not, in our judgment, at all susceptible to the construction that the county is not responsible for such taxes although collected.   The fourth question must be answered in the negative.

The fifth question is as follows: "Was the levy for State taxes made in the year 1893, by the secretary of State, State treasurer, and State auditor of the State of Wyoming, sitting as a board of equalization, in conflict with the provisions of Section 4, of Article 15 of the constitution of the State of Wyoming, where such levy was made up of the following items, to wit:

"For General Fund, three and seven-eighths mills on the dollar.

For University Income Tax, one eighth of a mill on the dollar.

For Fund for the Insane, three eighths of a mill on the dollar.

For State Bond tax, six tenths of a mill on the dollar.

For Capitol tax, one eighth of a mill on the dollar.

For Rawlins Penitentiary Building tax, three fourths of a mill on the dollar.

For Hospital Building tax, three and one fourth of a mill on the dollar."

Section 4 of Article 15 of the Constitution reads as follows:

"For State revenue, there shall be levied annually a

tax not to exceed four mills on the dollar of the assessed valuation of the property of the State, except for the support of State educational and charitable institutions, the payment of the State debt, and the interest thereon.''

The contention is that the levy for State taxes for 1893, violated that Section in this, that the tax for general revenue of three and seven-eighths mills, when added to the tax for capitol and penitentiary building, exceeded four mills, and that neither the capitol tax nor penitentiary tax comes within the exceptions noted in the section. The argument in the case was largely confined to the tax for the penitentiary building, it being insisted upon the part of the State that it was a tax for the support of a State charitable institution within the meaning of the constitution, and therefore exempted from the limitation of four mills, and the defendant contending to the contrary.

The same questions are said to arise as to the taxes for 1894, and 1895.

The territorial legislature of 1888 provided for the erection of a penitentiary building at or near the city of Rawlins, at a cost not exceeding one hundred thousand dollars, the funds therefor to be raised by the issuance of territorial bonds. L. 1888, Ch. 30. In pursuance of that act, a building was partially constructed, and at the time of the adoption of the constitution, was in an incomplete condition, territorial prisoners being confined partly in prisons of other States, and partly in the United States Penitentiary, located at Laramie City, the latter becoming the property of the State under the provisions of the act of admission.

The constitution located the penitentiary for ten years at Rawlins, but with the proviso that the Legislature might convert the said penitentiary to other public uses. Art. 7, Sec. 23.

In 1893 the Legislature enacted a law providing for the completion and repair of the State penitentiary building at Rawlins, as follows:

'' For the purpose of aiding in the completion of the

State penitentiary building situated at Rawlins, Carbon County, Wyoming, * * * for the year of eighteen hundred and ninety-three 'it shall be the duty of the State board of equalization, at the time of making the annual assessment for State purposes, or as otherwise provided by law, to direct the various boards of county commissioners of the several counties to levy on all taxable property, a tax of three fourths of one mill on each and every dollar of the assessed valuation of such property, and for the year 1894 a tax of one half of one mill on each and every dollar of such assessed valuation, which tax shall be levied, collected, and paid to the State treasurer in the manner provided by law for the levy, collection, and payment of other State taxes, and shall be paid out of the State treasury only for the purpose of aiding in the completion of, and keeping in repair, the State penitentiary building, situated at Rawlins, County of Carbon, Wyoming. Such tax shall be levied and collected in addition to any tax otherwise provided by law, and nothing in any act relating to State revenue, or in any other act, shall be construed to impede or limit the levy and collection of the tax named in this section; and the proceeds of such levy shall be used for the purpose named in this chapter." L. 1893, Ch. 17.

A similar statute was enacted in 1895, for raising funds by taxation in 1895 and 1896. L. 1895, Ch. 65.

The purpose of the tax is thus made plain. Is the completion and repair of the penitentiary building a purpose coming within the exception "for the support of State educational and charitable institutions"? The penitentiary is undoubtedly a State institution. It is reasonably clear that it is not to be classed as an educational institution as that term is employed in the constitution. The question remains whether 'it is included within the constitutional meaning and designation of a charitable institution.

It is said that the word "charity," in its widest sense, denotes all the good affections which men ought to bear

toward one another, and in that sense it embraces what is generally understood by benevolence, philanthropy, and good-will. In its more restricted sense it means merely relief or alms to the poor. 5 Am. & Eng. Ency. L., 2d ed., 894.

When used as descriptive of uses and trusts which will be upheld as charitable, it is not employed in either of the above. In the legal sense, charity " may be defined as a gift to be applied, consistently with existing laws for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting and maintaining public buildings or works, or otherwise lessening the burdens of government." Id. Another definition which has received approval by eminent authorities is, " whatever is given for the love of God, or the love of your neighbor, in the catholic and universal sense; given from these motives and to these ends; free from the stain or taint of every consideration that is personal, private, and selfish." Vidal v. Gerrard, 2 How. (U. S.), 127; Price v. Maxwell, 28 Pa. St., 35; and again, " A charitable use where neither law nor public policy forbids, may be applied to almost anything that tends to promote the well-doing and well-being of social man." Ould v. Washington Hospital, 95 U. S., 311; Tillman v. Green, 130 N. Y., 46.

In respect to a charitable use, a public charity is " a gift to a general public use which extends to the poor as well as the rich." Jones v. Williams, Ambler, 652. This statement has found approval in many cases. Again; To give it " the character of a public charity, there must appear to be some benefit to be conferred upon, or duty to be performed toward, either the public at large, or some part thereof, or an indefinite number of persons." Old South Soc. v. Crocker, 119 Mass., 1.

In the determination of a charitable use, trust, or bequest, courts have, generally at least, had reference to

the statute of 43 Eliz., ch. 4, and it is held that those purposes are charitable which are enumerated in that statute or are within its spirit and intendment.   Among the purposes there enumerated are "stock or maintenance for houses of correction" and "relief or redemption of prisoners or captives."   Under that statute many works of public utility have been held charitable, and generally anything which is a relief of public burdens.

In a comparatively recent case it was said that the definition of charities has been steadily broadening and in view thereof the following enlarged definition was ventured, "Whatever is gratuitously done or given in relief of the public burdens or for the advancement of the public good is a public charity."   Episcopal Academy v. Phila., 150 Pa., 565.   See also Donohugh's App., 86 Pa. St., 312; Boyd v. The Fire Ins. Patrol, 120 Pa. St., 624.

The attorney-general relies upon the statute of Elizabeth and the interpretation given to it by the courts and their construction of charitable uses and trusts, and insists particularly that penitentiaries and prisons are embraced within "stock and maintenance for houses of correction," and that in the light of the decisions upon the said subject the constitutional provisions must be interpreted.

On the other hand it is argued that the term "state charitable institution" was not employed in our constitution in the sense of a charitable use or bequest, and that if we have adopted the statute of Elizabeth and the definition of the word "charitable" thereunder, it has only been adopted for the purpose of upholding bequests.

Counsel for defendant further insists that the reference in the constitution to penal, educational, and reformatory institutions indicates that it was not the intention to comprehend all of them in the one word "charitable," and our attention is called to Section 18 of Art. 7, which provides for the establishment and support of such state charitable, reformatory, and penal institutions as the claims of humanity and the public good may require; and to Sec. 19 which declares that the property of all charitable and penal

institutions belonging to the territory shall become the property of the state.    The proposition is that had the framers of the constitution intended to include educational or penal or reformatory institutions within the one word "charitable," they would not have used the others at all.

It is not evident to us that a consideration of the use of those various terms in different parts of the instrument, and even associated in the same sentence or clause, is a determining factor in the case.    We are not prepared to credit those responsible for the phraseology of the constitution with a regard for such nicety of language as the argument would imply.

We observe that in Section 36 of Art. 3, it is provided that " No appropriation shall be made for charitable, industrial, educational, or benevolent purposes to any person, corporation, or community not under the absolute control of the state."    Here "charitable" and "benevolent" are both used in the same sentence.

The fact that in its narrow classification a penitentiary is a penal institution, and that kind of an institution is specifically mentioned by that name in other places in the constitution is not, to our minds, controlling of the construction to be given to the term "charitable institution" in the section referred to, if in the sense in which it was employed, such a concern as a penitentiary is in legal contemplation embraced therein.    It may, however, assist in arriving at the sense in which the term was employed, and so may other provisions of the constitution if they bear at all upon the question.    It is said in Story on the Constitution:

" It is by no means a correct rule of interpretation to construe the same word in the same sense wherever it occurs in the same instrument.    It does not follow either logically or grammatically, that because a word is found in one connection in the constitution, with a definite sense, therefore the same sense is to be adopted in every other connection, in which it occurs.    This would be to suppose that the framers weighed only the force of single words, as

philologists or critics, and not whole clauses and objects, as statesmen and practical reasoners.   And yet nothing has been more common than to subject the constitution to this narrow and mischievous criticism.   Men of ingenious and subtle minds who seek for symmetry and harmony in language, having found in the constitution a word used in some sense which falls in with their favorite theory of interpreting it, have made that the standard by which to measure its use in every other part of the instrument. They have thus stretched it, as it were, on the bed of Procrustes, lopping off its meaning when it seemed too large for their purposes, and extending it when it seemed too short." .Sec. 454.

Now, it is not true that the general legal definition of the terms "charity" and "charitable" are applied by the courts exclusively in the consideration of the legality of gifts and bequests.   In some of the states charitable institutions, or institutions of public charity, are exempted from taxation, and the courts, in determining whether a particular society or institution is within the exemption, commonly resort to the definitions of charitable trusts and uses, and the decisions growing out of the statute of Elizabeth.   See Phila. v. Keystone Battery, 169 Pa. St., 526, where the property of a military organization maintained by State appropriations and public subscriptions was held exempt from taxation on the ground that it was a purely public charity.   House of Refuge v. Smith, 140 Pa. St., 387, which was a case involving the taxation of the property of a corporation formed for the purpose of establishing and conducting an institution for the confinement and reformation of youthful delinquents.   The inmates were committed thereto by courts and magistrates, and no charge was made for their support, education, and maintenance, but it was supported by appropriations made by the city of Philadelphia, and the State, supplemented by the proceeds of the labor of the inmates.   The buildings and grounds were held exempt on the ground that it was a public charity.

In the case of Episcopal Academy v. Phila., supra, a

denominational school was held to be a public charity where the question at issue was whether its property was exempt from taxation, and in discussing the matter the statute of Elizabeth was referred to and commented on.

In State v. Ladies of the Sacred Heart (Mo.), 6 L. R. A., 84, the case involved a construction of the statutes affecting the duration of corporations, and turned upon the fact that the corporation in question was a charitable institution, although that fact was conceded.

Williamson v. Louisville Industrial School of Reform (Ky.), 23 L. R. A., 200, was an action for damages for personal injuries alleged to have been inflicted by the cruel acts of one of the defendant's servants. The defendant was a corporation whose object and business was to take charge of such youths as might be committed to it, and care for their moral and physical training and education. It was an agency of the State and maintained by taxation and State aid. The institution was held to be a charity, and therefore not liable.

In Perry v. House of Refuge, 63 Md., 20; 52 Am. R., 495, it was held that an action does not lie against a State House of Refuge for an assault upon an inmate by an officer thereof. The decision was based upon the principle that the institution was a charitable one. Although a corporation, it received municipal and State aid. It was founded as a place for the custody, care, and reformation of unfortunate youths, either vagrants, convicts, or such as are incorrigible by the ordinary discipline of parents and guardians. In discussing the question the court said:

"It has been urged, with much cogency in argument, that the organic principles on which this institution is founded constitute it an eleemosynary corporation holding its estates and funds in trust for charitable purposes, and that it is not therefore responsible as a defendant in an action for damages." "It can not be denied that the House of Refuge is an institution holding property contributed solely for benevolent purposes. If under the impulse of that humanity which is the distinctive characteristic of

the present age, associations are formed for the erection of
hospitals, with a view to afford relief to indigent sufferers
from physical afflictions, it might with obvious propriety be
suggested that an institution, originating in the co-opera-
tive action of benevolent individuals, and having for its
object the amelioration of the condition of unfortunate
minors who have become the victims of vicious habits and
propensities, should be designated as a hospital for the cure
of moral diseases.    Youths in whom the seeds of vice have
already germinated are placed there under proper restraint,
so that the growth of crime may be arrested or eradicated
in its incipiency.    Funds are contributed by individuals
impelled by philanthropic motives, and donations are
obtained from the municipal and State treasuries.    These
are the funds of the institution, controlled by the managers,
not for their own profit, but solely for the charitable pur-
poses designated by its organic law.    This, then, is an insti-
tution resting on an eleemosynary foundation.''

We are, however, of the opinion that it is, to say the
least, questionable whether the reference to a State chari-
table institution in the revenue article of the constitution
is in the sense entirely of an institution which when con-
ducted by individuals or private corporations, will be
regarded as charitable, or of one which will be held chari-
table when the recipient of donations or bequests.    We
are hardly prepared to assent to the theory that every insti-
tution of the State is a charitable one within the meaning
and intent of the term as employed in the constitution
exempting the support of such institutions from the limit
placed upon State taxation, although it may be one capable
of supporting a charitable bequest.

The more reasonable interpretation of the term as it is
employed in the constitutional provision under considera-
tion appears to us to be that character of institution which
springs from philanthropic or humane impulses, or is
prompted by a desire and purpose to ameliorate the con-
dition of the unfortunate, afflicted, or defective classes by
affording them proper and humane care, assistance, or

education, or placing them under suitable restraint, treatment, or reformatory influences, thereby not only benefiting the individual, but promoting the well-being of society.

It is apparently assumed by the learned counsel for defendant that because an institution is penal it possesses no attributes of charity. It will have been observed that the courts have not so regarded those which embrace, partly at least, penal characteristics.

The infliction of penalties for crime ceased long ago to be regarded as the execution of vengeance upon the criminal. The real object of punishment is the protection of society, and this includes the reformation of the offender. The result of the agitation for a more humane method in the treatment of prisoners and convicts actively commencing in the last century in England is the present system of prisons and industrial and reformatory schools.

Jeremy Bentham said, "General prevention ought to be the chief end of punishment as it is its real justification," and that, "it is elevated to the first rank of benefits when it is regarded not as an act of wrath or vengeance against a guilty or unfortunate individual who has given way to mischievous inclinations, but as an indispensable sacrifice to the common safety."

The modern idea and the causes contributing to its general prevalence, and the practical effects thereof are well expressed in an address recently delivered from which I quote.

"Among the triumphs of philanthropy in the nineteenth century are these: Imprisonment for debt has been abolished; judicial torture has been done away; accused persons are now assured fair trials, with lawyers to defend them and a right to subpœna witnesses; the death penalty has been nearly and in some places quite abolished; prisons have been transformed, so that most of them are now wholesome places of labor instead of physical and moral pest houses; juvenile delinquents are reformed instead of made criminals by the processes of law, and

reformation is coming more and more to be the ideal of prisons for adults; we have given eyes to the blind and speech to the deaf; we have provided kindly care for the insane and the idiots, instead of leaving them to the accidental cruelty or neglect of ignorance; we have provided for the relief of paupers in more careful and effectual ways; * * * In short, government has been forced to become the protector of the poor as well as the agent of the powerful, and philanthropy has become a part of the business of the State, and not merely the self-assumed sacrifice of a few individuals." President's Address, Conference of Charities and Correction, 1896.

The object of treatment of the criminal, as well as other unfortunates, is now generally recognized to be first a cure if possible, and if not, then by guardianship in or out of an institution.

Our constitution expressly adopts the humanitarian theory. In Section 14 of the Declaration of Rights it is provided: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment be inflicted." In Section 15, "The penal code shall be framed on the humane principles of reformation and prevention." In Section 16, "No person arrested and confined in jail shall be treated with unnecessary rigor. The erection of safe and comfortable prisons and inspection of prisons, and the humane treatment of prisoners shall be provided for."

It is thus declared in our fundamental law that the penal code shall be founded upon the humane principle of reformation and prevention. All reforms are slow of accomplishment, and prison reform is no exception, but great advancement has been made. One writer upon this subject has said, "The polestar of the present system is punishment, whereas the protection of society should be its sole object, and as punishment never made a sincere convert, and as the multitude of first offenders comes from the weaker class, they should be treated rather as wards

whom it may be necessary to confine, but whom it is yet necessary to train, and educate, if possible, into good citizens." Ency. of Social Reform, p. 996.

The reform, however, is gradually finding its way into legislation. Many illustrations of this might be given, such as provisions for indeterminate sentences, parole of prisoners, instruction to illiterate convicts in reading, writing, and arithmetic, and the requirement that a record shall be kept in which shall be entered all facts that can be ascertained from time to time as to each prisoner relating to parentage, early social influences, and his constitutional and acquired defects and tendencies. An estimate is to be made as to his character and the best method of dealing with him. These provisions are not found in the laws of all the States, and have not yet been adopted in our own State, but the general tendency of modern legislation is illustrated by them.

As has been suggested, the penitentiary is the outgrowth of the humane idea that the aim of government in the infliction of penalties should be the reformation of criminals. It was the direct result of long-continued agitation in the direction of that theory. The penitentiary was first proposed by Bentham, and the first time the term is probably mentioned in English law was in the Act of 19 Geo. 3, ch. 74 (1779), which provided for penitentiary houses. Not until many years later, however, did the English government attempt to erect a prison upon the new idea, and then it is said to have been the result of "fully recognizing the importance of attempting reformation by the seclusion, employment, and religious instruction of prisoners." It had, however, been tried with somewhat satisfactory results in certain localities in that country. A writer on political science has said on this subject, "Thus it may be seen that the modern prison system, at every stage of its evolution, revolves around one central thought,— the possibility of reformation; that the reformation of the prisoner is its one animating purpose; that the hope of reformation is the

motive to which it owes its origin; and posterity will pro-
nounce judgment upon it from this one point of view."
Lalor's Cyclopedia of Political Science and Political Econ-
omy, Vol. 3, p. 357.

Construing the terms "State Charitable Institution"
in the light of the constitutional provisions above men-
tioned, which require that the penal code shall be framed
upon the humane principles of reformation and preven-
tion, and as well according to the present-day notions of
the purpose of confinement and treatment of prisoners,
it is impossible to escape the conclusion that it can not
be confined to an institution which is designed merely for
the care of the poor and helpless, or the treatment of
those suffering from mere physical infirmities. Its mean-
ing and intent is broader than that, and we are convinced
that our penitentiary is reasonably within its purport
in the sense in which it is employed.

Counsel refers to the debates of the constitutional
convention. They seem to indicate that the term chari-
table was intended in a comprehensive sense. As first
reported by the committee, the section under consideration
limited the tax to four mills except for the payment of
the State debt, and "except for the support of State edu-
cational institutions;" a member (Mr. Clark) moved
to strike out the exception for educational institutions,
and in explanation thereof stated that in his judgment
all State institutions should stand on the same basis,
that it is hardly just to say that a State educational
institution may have a tax in excess of the four-mills
limit, and that other institutions shall be limited to the
general tax. Mr. Baxter then moved to insert the words
"and charitable," which was carried, and Mr. Clark's
motion was not acted on. It is now argued that it clearly
appears from the debates that the object was to limit
taxation. That may be conceded. It is as clearly
apparent that it was the intention to exclude from the
limit certain purposes of taxation; and we can not agree

with counsel that our construction will have the practical effect of defeating the limitation, either as expressed or intended by the convention.

It is further urged that a tax for the completion and repair of the penitentiary building is not a tax for the support of the penitentiary, even if the latter is to be included within the terms of the exception.

Counsel says that not one cent of the tax complained of goes for the purpose of maintaining the Rawlins Penitentiary or providing for it, but that it all goes toward its creation, and it is insisted that to hold that a tax for the *building* of an institution comes within the exception providing for the *support* of an institution, will give to the words a meaning different from that ordinarily applied to them.

That depends not only upon the meaning of the word "support," about which we have no disagreement with counsel, but as well upon the significance of the term "institution" as the thing which is to be supported. The sense in which "support" is to be held to have been used must be controlled by the context. An examination of the various provisions of the constitution wherein that word is found will disclose that it is generally employed in a rather comprehensive sense. For instance, certain funds and income are to be appropriated for the support of the common schools. Art. VII, Secs. 4, 5, 7. Money is required to be raised by taxation or otherwise necessary to the support and maintenance of the university in a condition of full efficiency. Sec. 16. Charitable, reformatory, and penal institutions shall be established and supported. Sec. 18.

If it be true that there can not be an institution such as a university, insane asylum, hospital, or penitentiary until it is in full operation and has managers, employees, or inmates, then counsel's proposition may be sound.

Buildings and suitable equipment are as essential to the operation of an institution as managers, employees, and inmates, or food, clothing, and medicine for those

under its care and treatment. It is to be observed that the exception is not expressly confined, as it is contended it should be, to the support of the employees and inmates of State institutions, but the institutions themselves are to be supported by the tax which is excluded from the limit placed upon the raising of ordinary State revenue. Every tax, therefore, which has for its object the support of the institution embraced within the exception, is comprehended by it.

In House of Refuge v. Smith, 140 Pa. St., 387, the court defined a house of refuge in respect to the laws of the State exempting charitable institutions from taxation. It was contended that a tract of land purchased in a county other than that in which the main buildings were situated was not a part of the institution, and was taxable. We quote a few passages from the opinion. "The workshop, the schoolhouse, the garden, and the field are therefore as truly a part of the plant as the place of detention itself." "The House of Refuge, looked at with reference to its reformatory work, consists of the superintendents, inmates, teachers, and keepers; but viewed with reference to its property and the question of taxation, the buildings and grounds legitimately used in its work are the House of Refuge." "The two departments, though separated by a county line and some miles of distance, will nevertheless constitute one whole under the same management and devoted to the same work, as truly as when inclosed within the same wall within the city. Together they will constitute the actual plant used in the reformatory work for which the House of Refuge was organized; and, looked at from the property point of view, they are the House of Refuge." "It is not merely a house with the necessary curtilage appurtenant to it, but a philanthropic establishment, an institution organized and maintained for the reformation of juvenile delinquents."

We are not of the opinion that the completion or erection of a building designed for the penitentiary is nothing more than the creation of the institution. The institution has

been established by law. It may have no inmates; it may not be in operation, or if so, not efficiently so for lack of room or equipment. It is nevertheless an institution, and particularly so in the constitutional sense of the term.

The greatest expense of an institution usually accompanies its being furnished with a home. Its needs require permanent buildings and other permanent facilities. Without them its work is incapable of satisfactory performance. It is hardly to be supposed that such an unreasonable situation was intended as to confine the expense of providing such permanent features within the limited tax, and to exclude therefrom only the annual disbursements required in the actual operation of the institutions. If the object of a tax is to provide the necessary buildings and equipment for an institution, without which it would be useless or inefficient, we are entirely clear that the tax is levied for the support of the institution. We perceive no warrant in the constitution for making a distinction between the support of an institution before it is in operation and afterward. The building is an integral part of the institution. The tax was levied for the support and maintenance of the building; for its completion and repair, it is true, but none the less for its support. It would indeed be a strange doctrine that money raised for the support of an institution, in the absence of any constitutional or legislative expression to the contrary, could not be lawfully appropriated toward the repair of its buildings and furnishing of necessary permanent equipment.

The statutes of this State have for many years provided that there shall be levied annually a tax "for the support of the common schools." The Act of Admission grants to the State sections 16 and 36 in every township "for the support of common schools." ' Would it be contended in the absence of express, adverse legislative provision that schoolhouses could not be erected or repaired from the proceeds of the tax, or the income, or avails from the donated public lands? Is not the erection of suitable buildings as necessary a part of the

support of the common schools, as the employment of teachers? What feature in the support of any public institution is more essential than providing a house in which its operations may be carried on, or in making such repairs as its condition demands?

We are unable to assent to the statement that no part of the tax went to maintain the Rawlins Penitentiary. If expended as the law directed, it all went to maintain it. It was not used to create the institution. It was used to create or complete a building for its permanent home. To erect a building does not constitute the creation alone of an institution. The building belongs to and is a part of the institution, but the institution itself comprises more than the building. As was said in House of Refuge v. Smith supra, it also "consists of the superintendents, inmates, teachers, and keepers." In other words, it embraces everything connected with its work and operation.

Our decision upon the fifth question is, that the levy for State taxes for 1893 was not in conflict with the provisions of Section 4 of Article 15 of the constitution.

The remaining questions depending upon a conclusion with reference to the fifth question different from that reached by the court, it is unnecessary to discuss or decide them.

Corn, J., and Knight, J., concur.