# Charles E. Stuart and others v. School District No. 1 of the Village of Kalamazoo and others.

*Union school districts: High schools: Taxation: Instruction: English language.* The right of school authorities in union school districts of this state to levy taxes upon the general public for the support of high schools, and by such taxation to make free the instruction of children in other languages than the English, is sustained.

*School district: Organization: User: Acquiescence: Collateral attack.* A school district which has assumed to possess and exercise all the rights and franchises of a regularly organized corporation for thirteen years, with entire acquiescence of everybody, is not liable to have the regularity of its organization, or of the legislation under which it acted, called in question thereafter in a merely private and collateral suit.

*School districts: Organization: Statute of limitations.* Whether or not the statute of limitations (*Comp. L.,* § *3591*) applies in terms to this case, where it is

not so much the organization of the school district that is questioned, as its authority to establish a high school and levy taxes therefor, it is strictly applicable in principle.

*Union school districts: Organization: User: Acquiescence: Presumptions.* The organization claimed and asserted by the district being that of a union school district, the presumption of organization arising from its user of corporate powers must be that of such an organization as its user indicates; and whether or not an acquiescence for the statutory period of two years will raise the presumption of regular organization, one of thirteen years certainly will.

*State policy: Education: Primary schools: Grade of instruction: Classics: Foreign languages.* The state policy of Michigan on the subject of education, and of the territory before the state was organized, beginning in 1817 and continuing down until after the adoption of the present constitution, is reviewed and considered, and the conclusion reached that there is nothing, either in our state policy, or in our constitution, or in our laws, restricting the primary school districts of the state in the branches of knowledge which their officers may cause to be taught, or the grade of instruction that may be given, if the voters of the district consent in regular form to bear the expense and raise the taxes for the purpose, or to prevent instruction in the classics and living modern languages in these schools.

*Superintendent: Appointment: District board.* The power to make the appointment of a superintendent of schools in a union school district is one that is incident to the full control which by law the district board has over the schools of the district.

*Bill to enjoin collection of school taxes: High school: Superintendent.* The decree below, dismissing the bill filed in this case to restrain the collection of such portion of the school taxes assessed against the complainants for the year 1872 as have been voted for the support of the high school in the village of Kalamazoo and for the payment of the salary of the superintendent, is affirmed.

*Heard July 10 and 15.    Decided July 21.*

Appeal in Chancery from Kalamazoo Circuit.

*Edwards & Sherwood* and *G. V. N. Lothrop*, for complainants.

*Dwight May* and *D. Darwin Hughes*, for defendants.

COOLEY, J.

The bill in this case is filed to restrain the collection of such portion of the school taxes assessed against complainants for the year 1872, as have been voted for the support of the high school in that village, and for the payment of the salary of the superintendent. While, nominally, this is the end sought to be attained by the bill, the real purpose of the suit is wider and vastly more comprehensive

than this brief statement would indicate, inasmuch as it seeks a judicial determination of the right of school authorities, in what are called union school districts of the state, to levy taxes upon the general public for the support of what in this state are known as high schools, and to make free by such taxation the instruction of children in other languages than the English. The bill is, consequently, of no small interest to all the people of the state, and to a large number of very flourishing schools, it is of the very highest interest, as their prosperity and usefulness, in a large degree, depend upon the method in which they are supported, so that a blow at this method seems a blow at the schools themselves. The suit, however, is not to be regarded as a blow purposely aimed at the schools. It can never be unimportant to know that taxation, even for the most useful or indispensable purposes, is warranted by the strict letter of the law; and whoever doubts its being so in any particular case, may well be justified by his doubts in asking a legal investigation, that, if errors or defects in the law are found to exist, there may be a review of the subject in legislation, and the whole matter be settled on legal grounds, in such manner and on such principles as the public will may indicate, and as the legislature may prescribe.

The complainants rely upon two objections to the taxes in question, one of which is general, and the other applies only to the authority or action of this particular district. The general objection has already been indicated; the particular objection is that, even conceding that other districts in the state may have authority under special charters or laws, or by the adoption of general statutes, to levy taxes for the support of high schools in which foreign and dead languages shall be taught, yet this district has no such power, because the special legislation for its benefit, which was had in 1859, was invalid for want of compliance with the constitution in the forms of enactment, and it has never adopted the general law (*Comp. L.*, § *3742*), by taking a vote of the district to establish a union school in accord-

ance with its provisions, though ever since that law was enacted the district has sustained such a school, and proceeded in its action apparently on the assumption that the statutes in all respects were constitutional enactments, and had been complied with.

Whether this particular objection would have been worthy of serious consideration had it been made sooner, we must, after this lapse of time, wholly decline to consider. This district existed *de facto*, and we suppose *de jure*, also, for we are not informed to the contrary, when the legislation of 1859 was had, and from that time to the present it has assumed to possess and exercise all the franchises which are now brought in question, and there has since been a steady concurrence of action on the part of its people in the election of officers, in the levy of large taxes, and in the employment of teachers for the support of a high school. The state has acquiesced in this assumption of authority, and it has never, so far as we are advised, been questioned by any one until, after thirteen years user, three individual tax payers, out of some thousands, in a suit instituted on their own behalf, and to which the public authorities give no countenance, come forward in this collateral manner and ask us to annul the franchises. To require a municipal corporation, after so long an acquiescence, to defend, in a merely private suit, the irregularity, not only of its own action, but even of the legislation that permitted such action to be had, could not be justified by the principles of law, much less by those of public policy. We may justly take cognizance in these cases, of the notorious fact that municipal action is often exceedingly informal and irregular, when, after all, no wrong or illegality has been intended, and the real purpose of the law has been had in view and been accomplished; so that it may be said the spirit of the law has been kept while the letter has been disregarded. We may also find in the statutes many instances of careless legislation, under which municipalities have acted for many years, until important interests have sprung up, which

might be crippled or destroyed, if then for the first time matters of form in legislative action were suffered to be questioned. If every municipality must be subject to be called into court at any time to defend its original organization and its franchises at the will of any dissatisfied citizen who may feel disposed to question them, and subject to dissolution, perhaps, or to be crippled in authority and powers if defects appear, however complete and formal may have been the recognition of its rights and privileges, on the part alike of the state and of its citizens, it may very justly be said that few of our municipalities can be entirely certain of the ground they stand upon, and that any single person, however honestly inclined, if disposed to be litigious, or over technical and precise, may have it in his power in many cases to cause infinite trouble, embarrassment and mischief.

It was remarked by Mr. Justice Campbell in *People v. Maynard*, *15 Mich.*, *470*, that "in public affairs where the people have organized themselves under color of law into the ordinary municipal bodies, and have gone on year after year raising taxes, making improvements, and exercising their usual franchises, their rights are properly regarded as depending quite as much on the acquiescence as on the regularity of their origin, and no *ex post facto* inquiry can be permitted to undo their corporate existence. Whatever may be the rights of individuals before such general acquiescence, the corporate standing of the community can no longer be open to question." To this doctrine were cited *Rumsey v. People*, *19 N. Y.*, *41*, and *Lanning v. Carpenter*, *20 N. Y.*, *447*. The cases of *State v. Bunker*, *59 Me.*, *366*; *People v. Salomon*, *54 Ill.*, *41*, and *People v. Lothrop*, *24 Mich.*, *235*, are in the same direction. The legislature has recognized this principle with special reference to school districts, and has not only deemed it important that their power should not be questioned after any considerable lapse of time, but has even established what is in effect a very short act of limitation for the purpose in declaring that

" Every school district shall, in all cases, be presumed to have been legally organized, when it shall have exercised the franchises and privileges of a district for the term of two years."— *Comp. L. 1871,* § *3591.* This is wise legislation, and short as the period is, we have held that even a less period is sufficient to justify us in refusing to interfere except on the application of the state itself.—*School District v. Joint Board etc., 27 Mich., 3.*

It may be said that this doctrine is not applicable to this case because here the corporate organization is not questioned, but only the authority which the district asserts to establish a high school and levy taxes therefor. But we think that, though the statute may not in terms apply, in principle it is strictly applicable. The district claims and has long exercised powers which take it out of the class of ordinary school districts, and place it in another class altogether, whose organization is greatly different and whose authority is much greater. So far as the externals of corporate action are concerned, the two classes are quite distinct, and the one subserves purposes of a higher order than the other, and is permitted to levy much greater burdens. It is not very clear that the case is not strictly within the law; for the organization here claimed is that of a union school district, and nothing else, and it seems little less than an absurdity to say it may be presumed from its user of corporate power to be a school district, but not such a district as the user indicates, and as it has for so long a period claimed to be. But however that may be, we are clear that even if we might be allowed by the law to listen to the objection after the two years, we cannot in reason consent to do so after thirteen. It cannot be permitted that communities can be suffered to be annoyed, embarrassed and unsettled by having agitated in the courts after such a lapse of time questions which every consideration of fairness to the people concerned and of public policy require should be raised and disposed of immediately or never raised at all.

The more general question which the record presents we

shall endeavor to state in our own language, but so as to make it stand out distinctly as a naked question of law, disconnected from all considerations of policy or expediency; in which light alone are we at liberty to consider it. It is, as we understand it, that there is no authority in this state to make the high schools free by taxation levied on the people at large. The argument is that while there may be no constitutional provision expressly prohibiting such taxation, the general course of legislation in the state and the general understanding of the people have been such as to require us to regard the instruction in the classics and in living modern languages in these schools as in the nature not of practical and therefore necessary instruction for the benefit of the people at large, but rather as accomplishments for the few, to be sought after in the main by those best able to pay for them, and to be paid for by those who seek them, and not by general tax. And not only has this been the general state policy, but this higher learning of itself, when supplied by the state, is so far a matter of private concern to those who receive it that the courts ought to declare it incompetent to supply it wholly at the public expense. This is in substance, as we understand it, the position of the complainants in this suit.

When this doctrine was broached to us, we must confess to no little surprise that the legislation and policy of our state were appealed to against the right of the state to furnish a liberal education to the youth of the state in schools brought within the reach of all classes. We supposed it had always been understood in this state that education, not merely in the rudiments, but in an enlarged sense, was regarded as an important practical advantage to be supplied at their option to rich and poor alike, and not as something pertaining merely to culture and accomplishment to be brought as such within the reach of those whose accumulated wealth enabled them to pay for it. As this, however, is now so seriously disputed, it may be necessary, perhaps, to take a brief survey of the legislation and gen-

eral course, not only of the state, but of the antecedent territory, on the subject.

It is not disputed that the dissemination of knowledge by means of schools has been a prominent object from the first, and we allude to the provision of the ordinance of 1787 on that subject, and to the donation of lands by congress for the purpose, only as preliminary to what we may have to say regarding the action of the territorial authorities in the premises. Those authorities accepted in the most liberal spirit the requirement of the ordinance that "schools and the means of education shall forever be encouraged," and endeavored to make early provision therefor on a scale which shows they were fully up to the most advanced ideas that then prevailed on the subject. The earliest territorial legislation regarding education, though somewhat eccentric in form, was framed in this spirit. It was "an act to establish the Catholepistemiad, or University of Michigania," adopted August 26, 1817, which not only incorporated the institution named in the title, with its president and thirteen professors, appointed by the governor, but it provided that its board of instruction should have power "to regulate all the concerns of the institution, to enact laws for that purpose," "to establish colleges, academies, schools, libraries, museums, atheneums, botanic gardens, laboratories and other useful literary and scientific institutions, consonant to the laws of the United States of America, and of Michigan, and to appoint officers and instructors and instructrices, in, among, and throughout the various counties, cities, towns, townships and other geographical divisions of Michigan." To provide for the expense thereof the existing public taxes were increased fifteen per cent., and from the proceeds of all future taxes fifteen per cent. was appropriated for the benefit of this corporation.—*Territorial Laws, Vol. 2, p. 104; Sherman's School Laws, p. 4.* The act goes but little into details, as was to be expected of a law which proposed to put the whole educational system of the commonwealth into the hands and under the control

of a body of learned men, created and made territorial officers for the purpose of planning and carrying it out; but the general purpose was apparent that throughout the territory a system of most liberal education should be supported at the public expense for the benefit of the whole people. The system indicated was prophetic of that which exists to-day, and is remarkable in this connection mainly, as being the very first law on the subject enacted in the territory, and as announcing a policy regarding liberal instruction which, though perhaps impracticable in view of the then limited and scattered population of the territory, has been steadily kept in view from that day to the present.

This act continued in force until 1821, when it was repealed to make way for one "for the establishment of an university," with more limited powers, and authorized only "to establish colleges, academies and schools depending upon the said university," and which, according to the general understanding at the time and afterwards, were to be schools intermediate the university and such common schools as might exist or be provided for.—*Code of 1820, p. 443; Code of 1827, p. 445.* In 1827 the educational system was supplemented by "an act for the establishment of common schools," which is also worthy of special attention and reflection, as indicating what was understood at that day by the common schools which were proposed to be established.

The first section of that act provided "that every township within this territory, containing fifty families or householders, shall be provided with a good schoolmaster or schoolmasters, of good morals, to teach children to read and write, and to instruct them in the English or French language, as well as in arithmetic, orthography, and decent behavior, for such term of time as shall be equivalent to six months for one school in each year. And every township containing one hundred families or householders, shall be provided with such schoolmaster or teacher for such term of time as shall be equivalent to twelve months for one

school in each year.    And every township containing one
hundred and fifty families or householders shall be pro-
vided with such schoolmaster or teacher for such term of
time as shall be equivalent to six months in each year, and
shall, in addition thereto, be provided with a schoolmaster
or teacher, as above described, to instruct children in the
English language for such term of time as shall be equiva-
lent to twelve months for one school in each year.    And
every township containing two hundred families or house-
holders shall be provided with a grammar schoolmaster,
of good morals, *well instructed in the Latin, French and
English languages,* and shall, in addition thereto, be pro-
vided with a schoolmaster or teacher, as above described, to
instruct children in the English language, for such term of
time as shall be equivalent to twelve months for each of
said schools in each year." And the townships respectively
were required under a heavy penalty, to be levied in case
of default on the inhabitants generally, to keep and main-
tain the schools so provided for.—*Code of 1827, p. 448; Ter-
ritorial Laws, Vol. 2, p. 472.*

Here, then, was a general law, which, under the name
of common schools, required not only schools for elementary
instruction, but also grammar schools to be maintained.
The qualifications required in teachers of grammar schools
were such as to leave it open to no doubt that grammar
schools in the sense understood in England and the Eastern
states were intended, in which instruction in the classics
should be given, as well as in such higher branches of
learning as would not usually be taught in the schools of
lowest grade.    How is it possible, then, to say, as the exi-
gencies of complainants' case require them to do, that the
term common or primary schools, as made use of in our
legislation, has a known and definite meaning which limits
it to the ordinary district schools, and that consequently
the legislative authority to levy taxes for the primary schools
cannot be held to embrace taxation for the schools sup-
ported by village and city districts in which a higher grade
of learning is imparted.

It is probable that this act, like that of 1817, was found in advance of the demands of the people' of the territory, or of their ability to support high schools, and it was repealed in 1833, and another passed which did not expressly require the establishment or support of schools of secondary grade, but which provided only for school directors, who must maintain a district school at least three months in each year.—*Code of 1833, p.' 129.* The act contains no express limitations upon their powers, but it is not important now to consider whether or not they extended to the establishment of grammar schools as district schools, where, in their judgment, they might be required. Such schools would certainly not be out of harmony with any territorial policy that as yet had been developed or indicated.

Thus stood the law when the constitution of 1835 was adopted. The article on education in that instrument contained the following provisions:

" 2. The legislature shall encourage by all suitable means the promotion of intellectual, scientifical and agricultural improvement. The proceeds of all lands that have been, or hereafter may be, granted by the United States to this state for the support of schools, which shall hereafter be sold or disposed of, shall be and remain a perpetual fund, the interest of which, together with the rents of all such unsold lands, shall be inviolably appropriated to the support of schools throughout the state.

" 3. The legislature shall provide for a system of common schools, by which a school shall be kept up and supported in each school district at least three months in every year; and any school district neglecting to keep up and support such a school may be deprived of its equal proportion of the interest of the public fund."

The fifth section provided for the support of the university, "with such branches as the public convenience may hereafter demand for the promotion of literature, the arts and sciences," etc. Two things are specially noticeable in these provisions: *first*, that they contemplated provision by

the state for a complete system of instruction, beginning with that of the primary school and ending with that of the university; *second*, that while the legislature was required to make provision for district schools for at least three months in each year, no restriction was imposed upon its power to establish schools intermediate the common district school and the university, and we find nothing to indicate an intent to limit their discretion as to the class or grade of schools to which the proceeds of school lands might be devoted, or as to the range of studies or grade of instruction which might be provided for in the district schools.

In the very first executive message after the constitution went into effect, the governor, in view of the fact that " our institutions have leveled the artificial distinctions existing in the societies of other countries, and have left open to every one the avenues to distinction and honor," admonished the legislature that it was their " imperious duty to secure to the state a general diffusion of knowledge," and that " this can in no wise be so certainly effected as by the perfect organization of a uniform and liberal system of common schools." Their " attention was therefore called to the effectuation of a perfect school system, open to all classes, as the surest basis of public happiness and prosperity." In his second message he repeated his admonitions, advising that provision be made for ample compensation to teachers, that those of the highest character, both moral and intellectual, might be secured, and urging that the "youth be taught the first principles in morals, in science, and in government, commencing their studies in the primary schools, elevating its grades as you approach the district seminary, and continue its progress till you arrive at the university." This message indicated no plan, but referred the legislature to the report of the superintendent, who would recommend a general system.

The system reported by superintendent Pierce contemplated a university, with branches in different parts of the state as preparatory schools, and district schools. This is

the parent of our present system, and though its author did not find the legislature prepared to accept all his views, the result has demonstrated that he was only a few years in advance of his generation, and that the changes in our school system which have since been adopted have been in the direction of the views which he then held and urged upon the public.     And an examination of his official report for 1837 will show that the free schools he then favored were schools which taught something more than the rudiments of a common education; which were to give to the poor the advantages of the rich, and enable both alike to obtain within the state an education broad and liberal, as well as practical.

It would be instructive to make liberal extracts from this report did time and space permit.     The superintendent would have teachers thoroughly trained, and he would have the great object of common schools " to furnish good instruction in all the elementary and common branches of knowledge, for all classes of community, *as good, indeed, for the poorest boy of the state as the rich man can furnish for his children with all his wealth.*"     The context shows that he had the systems of Prussia and of New England in view, and that he proposed by a free school system to fit the children of the poor as well as of the rich for the highest spheres of activity and influence.

It might also be useful in this connection to show that the Prussian system and that " of the Puritans," of which he speaks in such terms of praise, resemble in their main features, so far as bringing within the reach of all a regular gradation of schools is concerned, the system of public instruction as it prevails in this state to-day.     But it is not necessary for the purposes of the present case to enter upon this subject.     It must suffice to say that the law of 1827, which provided for grammar schools as a grade of common schools, was adopted from laws which from a very early period had been in existence in Massachusetts, and which in like manner, under heavy penalties, compelled the support

30 MICH.—11.

of these grammar schools in every considerable town.—See *Mass. Laws, 1789, p. 39;* compare *General Stat., 1860, p. 215,* § *2.*

The system adopted by the legislature, and which embraced a university and branches, and a common or primary school in every school district of the state, was put into successful operation, and so continued, with one important exception, until the adoption of the constitution of 1850. The exception relates to the branches of the university, which the funds of the university did not warrant keeping up, and which were consequently abandoned.    Private schools to some extent took their place; but when the convention met to frame a constitution in 1850, there were already in existence, in a number of the leading towns, schools belonging to the general public system, which were furnishing instruction which fitted young men for the university. These schools for the most part had been organized under special laws, which, while leaving the primary school laws in general applicable, gave the districts a larger board of officers and larger powers of taxation for buildings and the payment of teachers.    As the establishment and support of such schools were optional with the people, they encountered in some localities considerable opposition, which, however, is believed to have been always overcome, and the authority of the districts to provide instruction in the languages in these union schools was not, so far as we are aware, seriously contested.    The superintendent of public instruction devotes a considerable portion of his annual report for 1848 to these schools, and in that of 1849 he says: "This class of institutions, which may be made to constitute a connecting link between the ordinary common school and the state university, is fast gaining upon the confidence of the public.    Those already established have generally surpassed the expectations of their founders.  Some of them have already attained a standing rarely equaled by the academical institutions of the older states.  Large, commodious, and beautiful edifices have been erected in quite a

number of villages for the accommodation of these schools. These school-houses frequently occupy the most eligible sites in the villages where they are located.    I am happy in being able to state in this connection that the late capitol of our state, having been fitted up at much expense, was, in June last, opened as a *common school-house;* and that in that house is maintained a free school which constitutes the pride and ornament of the city of the straits."    This *common* free school was a union school equivalent in its instruction to the ordinary high school in most matters, and the report furnishes very clear evidence that the superintendent believed schools of that grade to be entirely competent under the primary school law.

It now becomes important to see whether the constitutional convention and the people, in 1850, did any thing to undo what previously had been accomplished towards furnishing high schools as a part of the primary school system.    The convention certainly did nothing to that end. On the contrary, they demonstrated in the most unmistakable manner that they cherished no such desire or purpose. The article on education as originally reported, while providing for free schools to be kept in each district at least three months in every year, added that " the English language and no other shall be taught in such schools."    Attention was called to this provision, and it was amended so as to read that instruction should be " conducted in the English language."    The reason for the change was fully given, that as it was reported it might be understood to prohibit the teaching of other languages than the English in the primary schools;    a result that was not desired. Judge Whipple stated in the convention that, in the section from which he came, French and German were taught, and "it is a most valuable improvement of the common school system."    The late superintendent Pierce said that in some schools Latin was taught, and that he himself had taught Latin in a common school.    He would not adopt any provision by which any knowledge would be excluded.    " All

that we ought to do is this: we should say the legislature shall establish primary schools." This, in his opinion, would give full power, and the details could be left to legislation.—See *Debates of the Convention, 269, 549.*

The instrument submitted by the convention to the people and adopted by them provided for the establishment of free schools in every school district for at least three months in each year, and for the university. By the aid of these we have every reason to believe the people expected a complete collegiate education might be obtained. The branches of the university had ceased to exist; the university had no preparatory department, and it must either have been understood that young men were to be prepared for the university in the common schools, or else that they should go abroad for the purpose, or be prepared in private schools. Private schools adapted to the purpose were almost unknown in the state, and comparatively a very few persons were at that time of sufficient pecuniary ability to educate their children abroad. The inference seems irresistible that the people expected the tendency towards the establishment of high schools in the primary school districts would continue until every locality capable of supporting one was supplied. And this inference is strengthened by the fact that a considerable number of our union schools date their establishment from the year 1850 and the two or three years following.

If these facts do not demonstrate clearly and conclusively a general state policy, beginning in 1817 and continuing until after the adoption of the present constitution, in the direction of free schools in which education, and at their option the elements of classical education, might be brought within the reach of all the children of the state, then, as it seems to us, nothing can demonstrate it. We might follow the subject further, and show that the subsequent legislation has all concurred with this policy, but it would be a waste of time and labor. We content ourselves with the statement that neither in our state policy,

in our constitution, or in our laws, do we find the primary school districts restricted in the branches of knowledge which their officers may cause to be taught, or the grade of instruction that may be given, if their voters consent in regular form to bear the expense and raise the taxes for the purpose.

Having reached this conclusion, we shall spend no time upon the objection that the district in question had no authority to appoint a superintendent of schools, and that the duties of superintendency should be performed by the district board.    We think the power to make the appointment was incident to the full control which by law the board had over the schools of the district, and that the board and the people of the district have been wisely left by the legislature to follow their own judgment in the premises.

It follows that the decree dismissing the bill was right, and should be affirmed.

The other Justices concurred.