The opinion of the court was delivered by
Monroe, J.
The plaintiff, appearing as a citizen and tax-payer, seeks to perpetually enjoin action by the city of New Orleans under an ordinance adopted by it and under any agreement, which may have been made pursuant thereto, between .said city and John II. Murray, whereby, it is alleged, that certain payments were to be made to said Murray from money coming into the city treasury; the grounds relied on being that the ordinance was ultra vires, for various reasons stated in the petition.
The city and Murray, as defendants, affirm the validity of the ordinance in question, and of the contract made .pursuant to its authority, and Murray alleges that he has furnished information and rendered services, which entitle him to the compensation, the payment of which is enjoined. There was judgment in the court a qua in favor of the plaintiff, perpetuating the injunction which had been issued, and decreeing the nullity of the ordinance and agreement in question, and defendants have appealed.
The facts, as they appear from the record, are as follows:
“Some time prior to February, 1898, Mr. Ambrose Smith, a member of the bar, called upon the Hon. Walter C. Flower, Mayor of New Orleans, and informed him that, in behalf of Mr. John H. Murray, he proposed to submit a proposition looking to the collection, by the city, of taxes due upon property which had escaped assessment, and *1228 asked the Mayor, in substance, whether such a proposition would be entertained. The Mayor replied that such propositions had frequently been entertained; and that the one referred to, if made, would be submitted to the Council; Shortly afterwards, he received from Murray, and submitted to the Council, .a letter in the following terms:
“To the Mayor and Council—
“The city of New Orleans has been, and is now, losing a large sum “ of money, which I believe I can recover and secure to the city. “ With this purpose, I have the honor to submit, for your considera- “ tion and action, the following proposition, to-wit: I will agree to “ give the information and the data in my possession, as also, in con- “ neetion with the city attorney, with his consent, the professional “ services of my attorney, in consideration of the city, through the “ proper authority, agreeing to pay me an adequate proportion of “whatever is realized, as a compensation for said services. If no “ amount be recovered and collected, no compensation whatever is to “ be due or demandable. If this proposition meets your approval, I “ hold myself in readiness to confer with your honor, or a comittee of “ the Council, and the city attorney, in regard to the details of a con- “ tract, and the work thereunder.”
The matter appears to have been referred to the Finance Commitee, by the Council, and that committee, after hearing Murray and his attorney, favored the acceptance of the proposition, but referred it to the Mayor and city attorney to get the benefit of their views as to the amount of compensation which should be allowed; and an agreement upon that point having been reached, the committee reported, and the Council adopted the following ordinance:
“No. 14,012, Council Series.
“Be it ordained, etc., That, in accordance with the proposition of “John IT. Murray, made to 'the city, on December 27, 1897, the “Mayor be, and he is hereby, authorized to contract with John IT. “ Murray for the recovery, and securing to the city, of certain sums of “ money and revenues of which the city has heretofore been deprived. “ The said John H. Murray to receive, as compensation for his infor“mation and services in said direction, fifteen (15) per cent, of an^- *1229 “ amount realized under said contract, up to $50,000, and ten per cent. “ (10 per cent.) on any amount in excess thereof, when covered into “ the treasury; and, provided, no compensation be due or demandable “by said John II. Murray except upon the amount recovered and col- “ lected under said contract, exclusive of the cost of collection; any “ costs of collection incurred by the city to be also deducted from the “ amount collected whenever the same are not recovered from the “ debtor. Adopted by the Council of the city of New Orleans, Febru- “ ary 8, 1898.”
Approved by the Mayor, February 9, 1898, and duly promulgated.-
It was considered unnecessary to reduce the contract to the form of a notarial act, and the Mayor and Murray, by common consent, put it in the shape of a communication and reply, as follows: On February 26, 1898, Murray wrote to the Mayor: “I hereby indicate my aecept- “ anee of the terms of Ordinance No. 14,012, Council Series, approved “ February 9, 1898, a copy of which is hereto attached.” And on the same day, the Mayor replied: “Your favor of even date, indicating “ your acceptance of the terms and conditions of Ordinance 14,012, C. S., approved February 9, 1898, is received; same is satisfactory.”
Thereafter, on March 1, 1898, Mr. Smith, representing Mr. Murray, addressed the following communication to the Board of Assessors, to-Wit:
“We have the honor to inform you that, under a contract with the- “ city of New Orleans, authorized and entered into under the provis- “ ions of Ordinance 14,012, Council Series, approved February 9, “ 1898, we have been employed to recover for the city, certain sums of “ money of which she has not been the beneficiary. We arc now ready “ to proceed in the direction of the fulfilment of said contract and the “ realization of such monies. In order to accomplish this result, the “ co-operation and action of your Honorable Board are necessary. “We should be pleased to confer with your Board relative to the “ details of procedure in this matter. Will you kindly designate the “ time and place at which such conference.will be most agreeable and “ convenient. We propose, under our contract with the city, to make “ amenable to taxation the property of various institutions, schools “an<l colleges, etc., which, heretofore, has escaped and been relieved “ from assessment and taxation. With the concurrence of your “ Board, a very large amount of money and revenue can, and will, be *1230 “ secured to the city and State, which, in the past, they have not “ received or enjoyed. An early response in the premises will be “ greatly appreciated,' and will materially advance us in -the contem- “ plated work.
“(Signed) John H. Murray,
“Per Ambrose Smith,

“Attorney.

The conference thus suggested was held, and Mr. Smith, as the attorney for Mr. Murray, submitted his views to the Board of Assessors .by means of an oral argument and a brief, which he had prepared, urging that body to assess the property of certain institutions which had theretofore been carried on the rolls as exempt. Upon March 12, 1898, he received a communication, stating that the Board declined'to take the action suggested. He thereupon called upon the Attorney General, and, laying the matter before him, invited his official co-operation and sanction in, and to, such legal proceedings as were deemed necessary, and such co-operation and sanction were accorded.
Mr. Smith, thereupon, prepared and filed the petition in a suit entitled, “State ex rel. M. J. Cunningham vs. Board of Assessors”, in which the State joined with it, as relators, the city of New Orleans and John H. Murray, and the purpose of which was to compel the defendant Board to assess the property to which its attention had been directed. He tried the case in the lower court, the trial ocupying a number of days, and brought it, by appeal, to this court, where, at his request, and that of the Attorney General, made at the suggestion of Mr. Smith, and in order that a judgment might be obtained in time to save the taxes of 1895 from prescription, the case was heard during the summer, and decided in December of 1898, though a rehearing was subsequently granted on a minor point, and the final judgment was rendered at a later date. State ex rel. Cunningham vs. Board of Assessors, 52 Ann. 223. On this trial, Mr. Smith presented elaborate arguments, orally and by briefs, both upon the original hearing and upon the rehearing.
The City Attorney testifies that he took no active part in the case, and that it was conducted by Mr. Smith, who originated the idea, and the Attorney General.
The Attorney General testifies that it was at Mr. Smith’s request that the suit was brought; that Mr. Smith did practically all of the work, and that the result was largely successful.
*1231 It further appears, from the evidence in the record, and from the case thus referred to, as reported, that property belonging to different institutions, religious, cháritable, and educational, situated in New Orleans, was carried on the assessment rolls as exempt from taxation, and that it had been so carried for many years; and the immediate purpose and effect of the suit thus brought, was to fix the slalus of such property, as property subject to taxation, and to secure for the city and State, the taxes for the year 1898, and three preceding years. Whether that property was legally subject to taxation, or was legally exempt, was a question which depended, primarily, upon the existence, or non-existence, of certain facts; and, thereafter, upon a construction of the law, and its application, as construed, to the facts and conditions found — that is to say, it had to be determined, in any given case, who used the property, and for what purpose; whether any income was derived from it, and if so, what became of it; after which, it became necessary to construe the proviso in Article 207 of the Constitution of 1879, which reads, "provided: the property so exempted be not used or leased for purposes of private or corporate profit, or income” and apply it as construed to the facts disclosed. By the decree of the court, it was held that the property known as “the Jesuits College, in so far as it is used as a residence by the priests, not teachers in the college”; “all the squares adjoining the Louisiana Retreat, save and “ except two of the said squares, required for the exercise of the in“sane; the squares adjoining the Leland University, held by that institution; the property adjoining Christ Church, known as the “Bishop’s residence; the row of frame houses * * * no part of “ St. Elizabeth’s Asylum; the property of the Young lien’s Christian “Association, except that part used as a library; and all the property “ of the Firemen’s Charitable Association, except that used as a eemo“tery”, should be assessed and taxed, although it had, theretofore, been treated as exempt.
It further appears, from the evidence in the case before us, that the city officials, and the assessors, knew that the different institutions mentioned owned the property in question, and also knew that it was carried on the assessment rolls as exempt; but it does not appear that they knew, certainly not in mo3t of the cases, for what specific purpose it was used, and, if they did know, in any particular case, the presumption, in the absence of proof to the contrary, is, that they believed *1232 that, being- so used, it was entitled to the exemption which they accorded.
The information, upon questions of fact, furnished by Murray, related, therefore, to the specific uses, rather than to the existence or ownership of the property to which he called attention; and the service otherwise rendered by him, through his attorney, consisted in, practically, bringing and prosecuting to final judgment, a suit, in which he convinced this court; that the property used in that way, although believed, by many lawyers and officials, and held by more than one court, to be exempt, was legally subject to taxation.
The City Attorney was of opinion that some of. the property was exempt. The Mayor testifies that, whilst, if the property is liable to taxation, it is proper that it should be taxed, and that if his attention had been called to it he would have communicated with the Council upon the subject, yet, that, if he had known, in advance, that Murray’s proposition involved the taxation of the property of eleemosynary institutions, the exemption of which had been long acquiesced in, he doubts whether he would have lent himself to its acceptance. The Attorney General states that he knew nothing as to most of the property, how it was used, or whether it was taxed, or untaxed, and, as to some of it, that he had been of opinion that it was exempt. And, finally, as we have seen, the assessors not only did not assess, but refused to assess, the property pointed out by Murray, and which, by reason of the suit brought by him, has been subjected to taxation, of which the city and State are now receiving the proceeds.
The only additional fact which it seems necessary to mention is, that the plaintiff in the instant case, being asked; “you allege in your petition, attacking this ordinance and the compensation provided for under it, that you would suffer injury, I would like to know what the character of that injury is, or was, at the time you filed this petition ?” To which he replied: “I certainly can not answer that.”
It is established, then, beyond peradventure, that, after the adoption of the ordinance in question, the Mayor of the city, acting, as he believed, pursuant to its authority, entered into the contract with Murray in the manner, as heretofore stated. It is shown that Murray and his attorney have fully and faithfully complied with that contract, and that the city is now enjoying the benefits resulting therefrom, and will continue to do so, to a greater or less degree, in the future. It further appears, that the city,, speaking through her authorized repre *1233 sentatives, is ready and willing to fulfill the obligations assumed by, her, under the contract which has thus been executed to her advantage; and, upon the other hand, it has not been made to appear, in what way the tax-payers at large, or the plaintiff in this suit, have been, or will be, injured by the ordinance, the contract, or the results. Furthermore, this suit was instituted more than seven months after the ordinance, which it attacks, was passed, after the Mayor had acted on it to the extent of entering into a contract, as contemplated by it, after Murray and Ids attorney had done the work and accomplished the results which they undertook to do and accomplish, after the city had been placed in a position to realize the advantages which had been promised; and only in time to prevent, and for the purpose of preventing, the city from fulfilling her obligations in the premises, by paying, as she had agreed to pay, those whose services she had received and is now profiting by.
Under these cireumstanes, we are of opinion that the cage presented by the plaintiff fails to show that any relief is needed and entitles him to none; and that it is, therefore, immaterial for its purposes, whether the agreement between the Mayor and Murray was ultra vires or intra vires, whether it involved more than five hundred dollars, or less, or whether it was in the usual form or some other form. There is a limit to the right of the individual citizen to meddle in the administration of governmental affairs which are entrusted to officers selected for that purpose, and that limit, we think, is reached' in a case, where the government, the citizens at large, and the individual citizen who complains, are shown to have derived all' the benefits, and full consideration, in a contract, entered into in good faith, on both sides, and executed in good faith by the other contracting party; and where the only purpose of the interference is to enable such government, citizens at large, and individual, whilst holding on to such benefits and consideration, to escape the correlative obligation resulting from their receipt and enjoyment.
The duty of a member of a private corporation, in the case of an ultra vires contract, is stated, by Professor Elliot, as follows: “If a stockholder desires protection against an ultra vires contract of 'the “ corporation, he must act promptly and energetically, or he will be “ bound by acquiescence. If he assents to the transaction, or, for an “unreasonable time, acquiesces, until the other party has acted on “ the faith of the transaction, so that he will suffer great injury by its *1234 “ repudiation, a court of equity will be slow in granting relief to such “ a stockholder.”
Elliot on Private Corporations, Par. 76; Clark on Corporations, 399; Cook on Stock and Stockholders, Par. 732; Taylor on Private Corporations, Par. 699; and text writers generally, to the same effect.
From the work last quoted, we also take the following expression of the consensus of opinion, upon another point:
“In fine, it must be made to appear to the court, that it is necessary “ for the protection of the plaintiff’s interests that he should be allowed to bring the action.” Taylor on Private Corporations, Par. 688.
The doctrine, as thus stated, founded in reason, good conscience, and the fundamental principles of equity, is also applied to the right of action existing in individual members of public corporations. “Generally speaking, equity will interfere in favor of, or against, municipal corporations on the same principles by which it is guided 'in cases between other suitors.” Dillon Munic. Corps., V. II, 1096, 4th Ed.
We, therefore, find, that it has been held that “though money has been illegally spent by a city or town, and though the petitioners' are entitled to resort to equity to restrain illegal appropriations, yet, if they have been guilty of gross laches, and have knowingly permitted third persons to incur liabilities, in good faith, relying upon such appropriation for re-imbursement, an injunction will be denied.” Tash vs. Adams, 10 Cush. (Mass.), 252; Stewart vs. Kalamazoo, 30 Mich., 69; People vs. Maynard, 15 Mich., 463.
In conclusion it is proper to say, that it is admitted, that the contract, between Murray and the city, entitles the latter, only, to the percentage, agreed on, upon the taxes collected from the property which formed the subject of the contract' and which may be covered into the Treasury, for the years 18.95,1896, 1897, and 1898, and does not entitle him to a percentage on the taxes of any other years, past or future.
It is therefore ordered, adjudged and decreed that the judgment appealed from be annulled, avoided and reversed, and that there now be judgment in favor of the defendants and appellants, and against the plaintiff and appellee, dissolving the injunction herein issued, and rejecting the plaintiff’s demand,, at his cost in both courts.