## SCHOOL DISTRICT NO. 21 IN FREMONT COUNTY v. THE BOARD OF COUNTY COMMISSIONERS OF FREMONT COUNTY ET AL.

SCHOOL DISTRICTS — TAXATION — INJUNCTION — RIGHT OF COUNTY COMMISSIONERS TO ENJOIN PAYMENT TO SCHOOL DISTRICT OF SPECIAL SCHOOL TAX—COLLATERAL ATTACK ON ORGANIZATION OF SCHOOL DISTRICT.

1. The board of county commissioners of a county does not have such an interest in the moneys collected by the county treasurer and ex-officio collector of taxes upon a special school district tax as will enable it to maintain a suit to enjoin the payment thereof by such treasurer and ex-officio collector to the treasurer of the school district.

2. The legality of the organization of a school district cannot be questioned in an action brought to enjoin the payment to the treasurer of the district of moneys collected by the county treasurer and ex-officio collector of taxes upon a special tax voted by such district.

3. The validity of the organization of an existing school district appearing to have been organized by the county superintendent of schools can only be questioned and determined in a direct proceeding brought for that purpose.

4. In a suit to enjoin the payment of a special school tax by the county tax collector to the treasurer of the school district which voted the tax, such school district appearing to have been organized by the county superintendent of schools must be deemed to have been legally organized and existing as such.

[Decided July 7, 1906.]                    (86 Pac., 24.)

ERROR to the District Court, Fremont County, HON. CHARLES E. CARPENTER, Judge.

The material facts are stated in the opinion.

*E. H. Fourt,* for plaintiff in error.

The only question involved is whether the school district, which lies within the limits of the Shoshone Indian Reservation, was or was not, for that reason, lawfully organized. It was sought by the petition in the case to question the right to organize a school district upon an Indian reservation.

The state was admitted with certain geographical boundaries. (Art. 11, Sec. 1, Const.) The counties then existing were declared to be the counties of the state. (Art. 12, Sec. 1, id.) The state was admitted on an equal footing with the original states of the Union in all respects (Act of Admission, Sec. 1), except that provision was made in the act of admission for the government and control of the National Park by Congress. (Id., Sec. 2.) Exclusive jurisdiction was afterward ceded to the United States by the State Legislature over the territory within the Shoshone Indian Reservation, saving to the state the right to serve civil and criminal process therein in a certain general class of suits, and saving to the state also the right to tax persons and corporations, their franchises and property on the reservation.

The intention of the act of cession was, we think, merely to give the general government ample authority to exercise jurisdiction over the Indians, that its duty toward them might be properly performed. The act, however,

was not necessary, for the reason that, under the commerce clause of the federal constitution, the national government possesses all the authority required.  If the act of cession goes beyond that purpose it is void, and would be inconsistent with the admission of the state on an equality in all respects, except as above stated, with the original states.  (*In re* Langford, 118 U. S., 375; Langford v. Monteith, 102 U. S., 145; *In re* Gon-Shay-ee, 130 U. S., 343;  U. S. v. McBratney, 104 U. S., 621;  Cherokee Tobacco Co. v. U. S., 78 U. S., 616;  Kansas Indians v. Board, &c., 5 Wall, 737; Draper v. U. S., 164 U. S., 238; Ry. Co. v. Lowe, 114 U. S., 525;  Benson v. U. S., 146 U. S., 325;  1 Madison's Journal Const. Conv., 662, 753, 754; Sinks v. Rease, 19 O. St., 306; *In re* Kelly, 71 Fed., 545;  State v. Doxtater, 2 N. W., 467; Stiff v. McLaughlin, 48 Pac., 232;  Keokuk v. Ulam, 38 Pac., 1081;  24 U. S. Stat., 388;  1 Rev. Supp. 1891, 536;  Wolf v. Hitchcock, 187 U. S., 550;  Cherokee Nation v. Hitchcock, id., 294; *In re* Now-ge-zhuck, 76 Pac., 877;  Schriber v. Langlade, 29 N. W., 547.)  To say that Indians, or others, lawfully residing upon the reservation, shall not be permitted to vote or to enjoy school privileges, or to have the protection of the state laws, is to deny what the statutes of the United States have expressly said that they shall have.  (*In re* Heff, 197 U. S., 488; Torrey v. Baldwin, 3 Wyo., 430;  Sec. 3, Ordinances of Const. Wyo.) The act of cession is a grant, if anything, and as such is specially prohibited, in so far as it deprives of the power to tax.  (Const. Wyo., Art. 15, Sec. 14.)

The Indians upon the reservation have nearly all accepted allotments of their lands in severalty, though some adjustments are now being made.  When the Indians have accepted their lands and are living in severalty, and in this way have renounced tribal relations, they are, under the federal statute, citizens of the United States, and entitled to all the rights, privileges and immunities of any other citizen of the United States.  The constitution of

Wyoming provides that every citizen of the United States of the age of twenty-one years, and upward, who has resided in the state or territory a year, and the county sixty days, shall be entitled to vote (Art. 6, Sec. 2), and the only thing which can prevent an Indian on the reservation from voting is the educational qualification found in the state constitution. Citizenship is determined by the law of the United States, and our constitution expressly provides that citizens of the State of Wyoming, both male and female, shall enjoy all civil, political and religious rights and privileges. (Sec. 1, Art. 6.) It will, we think, be conceded that the white people as well as the Indians residing upon the Shoshone Indian Reservation, and within the geographical boundaries of the State of Wyoming, had the right to vote under the constitution of Wyoming, and the act admitting the State of Wyoming without any exclusions. There is nothing to prevent their exercising that right still, unless it be found in the law of 1893, which ceded jurisdiction over the reservation back to the United States. And the question for this court to determine is whether or not the Legislature, without the consent of the people, can cede the sovereign rights of the people, or the sovereignty of the state over any portion of the state or of any county. If the Legislature has power to cede the sovereignty of the state over the Indian Reservation, then it would have power to cede away the jurisdiction of the state over any other county or portion of the state. It has no such power. (Matt. v. R. R. Co., 30 Pa. St., 9; *In re* O'Connor, 37 Wis., 379; Treat v. Lord, 42 Me., 552; Chancely v. Bailey, 37 Ga., 532; Moore v. Shaw, 17 Cal., 199.)

The federal government has never accepted the jurisdiction ceded by the state over the reservation and the United States courts have many times refused to take jurisdiction over other places, under similar conditions.

By an examination of the report of the Secretary of the Interior, it will be seen that public schools are maintained

among the Omahas and Winnebagoes in Nebraska. (Report Secy. Int. Indian Affairs, 1903, p. 202.) And at Fort Hall, Idaho. (Id., 153.)

It was urged in oral argument, to the lower court, that the Federal Court at Cheyenne has taken jurisdiction over cases upon the Indian Reserve in question, and I am forced to admit that this is true in a limited sense, but none of the cases have been of very great importance, and I am also informed that the question of jurisdiction has never been raised.

*J. S. Vidal* and *S. T. Corn,* for defendants in error.

The cases which seem to be relied upon by counsel for plaintiff in error are directed mainly to such questions as whether process of the courts may run upon Indian reservations, and whether under the statutes, applicable to the particular case, jurisdiction of crimes rests in the federal or in the state or territorial courts. And they affect this case, if at all, only remotely. If it is competent for the authorities of a state or territory to establish school districts and maintain public schools under state or territorial laws, upon an Indian reservation, independent of and disregarding the authority of the general government, it is remarkable that none of the cases cited by counsel furnish any hint that it has ever before been done or attempted. And we have not been able to find any instance of such an attempt. This is not a matter of accident arising out of a lack of public interest in education upon such reservations, for Congress has carefully provided by statute for the education of Indians residing thereon, and appropriates large sums of money for the purpose. It is also a matter of public notoriety, of which this court will no doubt take judicial notice, that various religious denominations have established and maintain schools upon the reservation by the consent of the government. Indeed, Congress formerly made appropriations in aid of such denominational schools. We think it is evident, therefore, that it must have been

recognized that there was some fundamental objection to the establishment and maintenance of such schools.

Moreover, while, so far as we have been able to ascertain, there are no decisions directly upon the question whether such a school may be established and maintained upon a reservation, it seems to be taken for granted that it cannot be. (Torrey v. Baldwin, 26 Pac., 908; Thomas v. Gay, 169 U. S., 276.)

A consideration of the conditions existing upon the reservation will, we think, make it plain that the establishment of a school district there is not only without authority of law, but is a legal impossibility. By the treaty between the United States and the Shoshones the government agreed that "no persons except those designated and authorized so to do, and except such officers, agents and employees of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon or reside," in the territory set apart for the reservation. This treaty is no doubt still in force, as to its substantial provisions, never having been abrogated by any subsequent agreement between the contracting parties nor by any statute of the United States, though doubtless some of its provisions may have become inoperative by reason of changed conditions. Doubtless also the provision to exclude unauthorized persons from the reservation has been very imperfectly enforced. But it has, nevertheless, remained at all times the duty of the government to enforce it whenever the protection of the Indians might require its enforcement. Indeed, independent of any treaty stipulations, the government having assumed the obligation of protecting the Indians upon their reservations from the encroachments of the white race, it follows necessarily that it must retain the control of the reservations in this respect. (State v. Denoyer, 6 N. D., 594; Beck v. Real Estate Co., 65 Fed., 35; U. S. v. Flournoy, 69 Fed., 892.) And it has been decided that even where the land has been

allotted to the Indians in severalty and the allottees have become citizens, the United States is not relieved from its duty of keeping intruders off of the reservation. (U. S. v. Mullin, 71 Fed., 682.)

It would seem to be, what may perhaps be termed, a physical impossibility to set up the machinery of a school district upon a reservation. By Section 525, Rev. Stat., Wyo., there must be elected three trustees possessing the qualifications of electors of the district. But no person can become a qualified elector of such a district owing to the impossibility of acquiring a permanent legal residence therein. And no election could be held because there could be no qualified electors of the district to vote at such election. Any purchase or lease of land as a site for a school building, without the authority of the general government, would be absolutely void, and every person taking any steps in carrying out the purposes of the organization, without such authority, would be a trespasser at every stage of the proceedings. The court will doubtless take judicial notice in this case that there are no lands upon the reservation subject to state taxation. Even when lands have been allotted to the Indians in severalty and they have obtained their preliminary patents and become citizens, their lands or permanent improvements thereon are not taxable. (U. S. Rickert, 188 U. S., 432.)

By Sections 554 and 555, Revised Statutes of Wyoming, attendance at school is made compulsory as to all children within the school age, who are resident within the district. There is no exception in the case of Indian children and by the terms of the statute all the Indian children of school age residing upon this reservation would be required to attend school, in the face of the well-established principle that the Indians are the wards of the United States, and that the control of all matters affecting them, at least while upon their reservations, is exclusive of any right of the states. Even when Indians have received their allotments in severalty and become citizens, the reservation is not

abolished and the government does not lost its right to exclude intruders. (Eells v. Ross, 64 Fed., 419; U. S. v. Flournoy, &c., Co., 71 Fed., 576.) If the act of cession is operative, there can be no question that the state had no more right to erect a school district upon the reservation than to erect one in another state, and this, as we understand it, is conceded by counsel for plaintiff in error. But 'it is insisted that the Legislature had no power to cede such jurisdiction and that the act is void. And this view of the matter seems to be sustained by the case of *In re* O'Connor, cited by counsel—a Wisconsin case. But the entire subject is reviewed and the opposite conclusion reached by the Supreme Court of the United States, in Fort Leavenworth R. R. Co. v. Lowe, 114 U. S., 525. We suppose this court will take judicial notice that the courts of the United States now exercise exclusive jurisdiction of all matters occurring upon the reservation. We are not aware of any act of Congress formally accepting the cession, but we take it that no express acceptance is necessary. (Virginia v. West Virginia, 71 Wall, 67.)

Scott, Justice.

The defendant in error, the Board of County Commissioners of Fremont County, Wyoming, commenced this action in the District Court of that county against Peter P. Dickinson as County Treasurer and ex-officio Collector of Taxes to restrain and enjoin him from paying to the plaintiff in error certain taxes which had been theretofore levied, and which might thereafter be collected for school purposes. A temporary injunction was allowed and thereafter, upon application of the school district, it was made a party defendant and permitted to defend in the action, and filed a demurrer to the petition on the ground that upon its face it did not state facts sufficient to constitute a cause of action against said school district. The demurrer was overruled, to which ruling exception was duly taken and the school district elected to stand upon the demurrer and

the ruling thereon, and thereupon the defendant Dickinson being in default for answer or other pleading, judgment was rendered continuing the temporary injunction in force and perpetually enjoining the defendant Dickinson as Coutny Treasurer and ex-officio Collector of Taxes and his successors in office from paying to said school district the amount or any part of the moneys so collected and received, or that may thereafter be collected pursuant to the levy therefor. The school district brings the case here on error.

1. For the purpose of deciding the demurrer everything which is alleged in the petition must be deemed and taken as true. It is alleged that the school district lies wholly within the limits of the Shoshone Indian Reservation and within said county, and that it was organized in 1902 by the Superintendent of Schools of the county; that the district on May 4, 1903, voted a special school tax of eight hundred dollars, and that the Board of County Commissioners levied a tax of four mills on the dollar of the assessed valuation of property within the district for the purpose of raising said tax, two hundred and twenty dollars of which has been paid to the County Treasurer and ex-officio Collector of Taxes by various taxpayers of said district, and that more or all of said taxes may be paid to said Treasurer and ex-officio Collector of Taxes at any time, who threatens and is about to pay over to the treasured of said school district the said sum so collected or that may hereafter be collected under and in pursuance of said special school tax levy for said school district. The board further avers that it has reason to believe and does believe that the organization of said school district was illegal, as was also the levy of said special school tax, and that the moneys so collected should be refunded to the parties who paid them; that said board is about to commence a suit to determine the legality of the organization of said school district; that if such moneys be paid to the treasurer of said school district, the board will be unable, if it should be determined that said district was illegally organized, to

pay or order repayment thereof to those who have paid or may pay said tax and thus work irreparable injury to the board and the taxpayers of the county.

The prayer is that the County Treasurer and ex-officio Collector of Taxes be perpetually enjoined from paying moneys so collected or which may be hereafter collected to the treasurer of said school district, and for such other and further relief to which it may in equity be entitled, and for costs.

Section 13, Article XV, of the Constitution, is as follows: "No tax shall be levied, except in pursuance of law, and every law imposing a tax shall state distinctly the object of the same, to which only it shall be applied." Under the provisions of this section it was held by this court in State v. Commissioners of Laramie County, 8 Wyo., 104, that a deficiency in the state tax due from the county could not be paid out of the fund raised for general revenue purposes in the county, and that a tax levied for county revenues "can be applied for no other purpose." Such is the law applicable to the different county funds the expenditure of which within the limits prescribed by statute is lodged with the County Commissioners. The funds over which the board have control are pointed out and designated in Section 1087, Revised Statutes of Wyoming, 1899, which is as follows: "The County Treasurer shall receive all moneys belonging to the county and state from whatever source they may be derived, and all moneys directed by law to be paid to him. All moneys received by him for use of the county shall be paid out by him only on the orders or warrants issued by the Board of County Commissioners, as prescribed by law, except when special provisions for the payment thereof shall be otherwise provided by law." The County Treasurer is by virtue of his office collector of taxes (Sec. 1085, R. S. Wyo.), and as such receives "all moneys directed by law to be paid to him." As such collector of taxes he received the moneys involved in this suit which belonged neither to the state nor the county; and he was

not authorized to pay the same into the county treasury. It formed a fund distinct in itself, separate and apart from the general school fund of the county, the disposition of which is independent of the Board of County Commissioners, and, unlike the general fund for school purposes, it is neither apportioned nor paid out on order of the County Superintendent of Schools. Section 1822, Revised Statutes of Wyoming, which has reference to taxes for school purposes, is as follows: "The amount of tax collected by the County Collector shall be held by said County Treasurer subject to the draft of the County Superintendent and shall be paid over accordingly; *Provided,* That the money collected on the district tax rolls shall be paid by the treasurer directly to the treasurer of the proper district, and his receipt taken therefor." The tax roll here referred to is the list of taxes voted by and at the regular school meeting in the school district and certified to the County Assessor by the clerk of such district and which are separately scheduled. (Chap. 79, Sec. 13, S. L. 1903.) It is difficult to understand, in view of the provisions of the statute, already referred to, what authority or interest the Board of County Commissioners has over or in the money here involved which is in the hands of the collector of taxes and the disposition of which is attempted to be questioned, and we are of the opinion that the board has not such an interest as will enable it to maintain this suit.

2. The object and scope of the action goes far beyond the mere preservation of the money arising from the special school tax and strikes at the legality of the organization and existence of the school district. By Section 1195, Revised Statutes of Wyoming, as amended in Chapter 20, Session Laws of 1901, it is made the duty of the County Superintendent of Schools to divide the county into school districts. Where the boundaries of a school district are so designated or formed provision is made for organization of such district by the election of trustees (Sec. 523, R. S. Wyo.) ; and an appeal may be taken from the organization

of the district by a majority of the voters who may not be satisfied with such formation to the Board of County Commissioners. (Sec. 524, R. S. Wyo.) The allegation in the petition that the school district was organized by the County Superintendent of Schools carries with it the presumption that all of the steps required by the statutes have been complied with to perfect its organization. Being so organized, it became and is a body corporate (Sec. 529, R. S. Wyo.), and as such has certain powers vested in it. Suits may be brought by or against it in its corporate name. Within certain limits as to taxation, it is authorized to vote such sums of money as may be necessary to build, rent or purchase a school house, or school houses, and in general to maintain and keep up in a proper manner such school or schools in the district as may be necessary for the accommodation, comfort and education of the children of school age therein. (Chap. 63, S. L. 1903.)

It appears on the face of the petition that School District No. 21 was organized within the boundaries of Fremont County, and that the Board of County Commissioners is about to commence or institute an action to determine the legality of its organization. It was evidently the theory of the pleader that such question could not be determined in this suit, and he was correct in his conclusions, for that question can only be determined in a direct proceeding. In Burnham v. State, 167 Mo., 17, which was an action to recover taxes which were levied for school purposes, it was sought to question the validity of the organization of a school district. The court said: "Confusion amounting to chaos would result if the life of every municipal or other corporation in the state could be assailed in this manner." In Stuart v. School District, 30 Mich., 69, it was also sought to question the validity of the organization of a school district. That court said, Cooley, J., delivering the opinion: "If every municipality must be subject to be called into court at any time to defend its original organization and its franchises at the will of any dissatisfied citizen

who may feel disposed to question them, and subject to dissolution, or be crippled in authority and powers if defects appear, however complete and formal may have been the recognition of its rights and privileges, on the part alike of the state and its citizens, it may very justly be said that few of our municipalities can be entirely certain of the ground they stand upon, and that any single person, however honestly inclined, if disposed to be litigous, or over technical and precise, may have it in his power in many cases to cause infinite trouble, embarrassment and mischief." In Trumbo v. The People, 75 Ill., 561, judgment was recovered for a school tax levied upon certain lands belonging to Trumbo who appealed. The case was tried in the lower court upon an agreed statement of facts from which it appeared, that, contrary to the provisions of the statute, the district lines of the new school district were within one mile of the school houses in each of two older established districts from which it was formed. That court said: "Yet, notwithstanding the school district was thus illegally formed, in violation of this statutory condition, a majority of the court are of the opinion that, in this collateral proceeding, the legality of the formation of the district cannot be inquired into, but that it must be taken to have been rightfully formed; and that the only mode in which the illegality can be inquired into and taken advantage of is by information in the nature of *quo warranto.*"

The rule announced in these cases is in line with the decisions of the various courts of last resort. (*Ex parte* Moore, 62 Ala., 471; Seavey v. Yarnell, 47 Ark., 269; Mullikin v. Bloomington, 72 Ind., 161; Mendenhall v. Burton, 42 Kan., 570; Chicago, &c., R. Co. v. Kentwood, 49 La. Ann., 931; St. Paul Gaslight Co. v. Sandstone, 73 Minn., 225; State v. Whitney, 41 Neb., 613; Rellstab v. Belmar, 58 N. J. L., 489; Gardner v. Christian, 70 Hun (N. Y.), 547; Henderson v. Davis, 106 N. Car., 88; Coler v. Dwight School Tp., 3 N. Dak., 249; Graham v. City of Grenville, 67 Tex., 62; El Paso v. Ruckman, 92 Tex., 86;

Hornbrook v. Elm Grove, 40 W. Va., 543; Shapleigh v. San Angelo, 167 U. S., 646.) The foregoing are but a few of the many cases which support the rule and are referred to without further comment than as showing how firmly the courts adhere to the rule that the existence of a municipal corporation cannot be questioned except in a direct proceeding; nor do we think the opinion of the Supreme Court of Tennessee in Angell et al. v. Town of Spring City, 51 S. W. (Tenn.), 191, is at variance with these decisions. In that case the decision was based upon a statute which provided that unless certain prerequisites were done and made of record in the matter of the incorporation of a town its charter should upon its face be void. We have no such provision in our statutes with reference to school districts.

It necessarily follows that for the purposes of this case School District No. 21 in Fremont County, Wyoming, must be deemed to have been legally organized and existing as such, and that the court erred in overruling the demurrer to and rendering judgment upon the petition.

The judgment is reversed and the temporary injunction vacated, and the cause remanded with directions to the lower court to dismiss the case.

POTTER, C. J., and BEARD, J., concur.